STATE OF NEBRASKA, APPELLEE, V. PATRICIA VALDEZ, APPELLANT.
STATE OF NEBRASKA, APPELLEE, V. EMILIO D. VALDEZ, APPELLANT.

562 N.W.2d 64

Filed March 4, 1997.    Nos. A-96-104, A-96-299.

Randall L. Lippstreu and Robert M. Harris, of Harris & Lippstreu, P.C., for appellant Patricia Valdez.

Lawrence G. Whelan for appellant Emilio D. Valdez.

Don Stenberg, Attorney General, David Arterburn, and James Elworth for appellee.

SIEVERS, MUES, and INBODY, Judges.

MUES, Judge.

Emilio D. Valdez and Patricia Valdez appeal their convictions for possession of a controlled substance with the intent to manufacture, distribute, deliver, or dispense the controlled substance, in violation of Neb. Rev. Stat. § 28-416(1)(a) (Cum. Supp. 1994). Both Emilio and Patricia assert that the district court erred by failing to sustain their motions to suppress.

## I. STATEMENT OF FACTS

In January 1995, law enforcement officers set up a surveillance of the home of Emilio D. Valdez and Patricia Valdez, whom they suspected of cocaine trafficking. The surveillance was conducted in accordance with a plan established by Officer Mark Overman. In preparation for the surveillance, a briefing was held during which Overman informed the other officers that a warrant to search the Valdez home was being prepared, but that more information was needed to establish the requisite probable cause.

The plan, according to the briefing, was to stop any of six named suspects, whom the officers suspected of drug involvement, if one of the suspects was observed stopping briefly at the Valdez residence. The stop of the suspect was to take place regardless of whether the suspect violated any traffic laws or behaved in a suspicious manner. The stop was to occur well away from the Valdez residence to prevent the Valdezes from seeing the stop and then destroying evidence. Once the suspect was stopped, the officers were to request permission to search the suspect's vehicle. However, a search was to occur regardless of whether consent was given. If drugs were found, the suspect was to be asked where the drugs came from and specifically if the drugs came from the Valdez house. *Miranda* warnings were not to be read to the suspect, as the police were "not interested in these people implicating themselves," but only in what

the suspect would say regarding the Valdezes. The plan then provided:

> If we believe that the drugs were purchased from the [Valdez] residence, then the house custody team will take custody of the house, to prevent the destruction of evidence. <u>NO SEARCHING IS TO TAKE PLACE UNTIL A WARRANT IS OBTAINED!!</u> Anyone that is at the house will be contacted by the team, and informed that a warrant is being sought. They are to be informed that they are not under arrest at this time, but since we will be seeking a warrant to search Emilio and Patricia, and probably anyone else that we find at the house, then anyone there will not be free to go unless they consent to be searched before the warrant arrives. Searches of parties suspected of carrying drugs should be strip searches, conducted in accordance with existing policy.

(Emphasis in original.)

On March 17, 1995, during a surveillance of the Valdez home, Nancy Herman, one of the six named suspects, was observed making an 8-minute stop at the Valdez residence. The officers then stopped Herman approximately six blocks from the Valdez home at a stop sign. Overman, who drew his weapon upon exiting his vehicle, stated that Herman appeared to be trying to conceal something under her seat. Overman replaced his gun in his holster, Herman was removed from her vehicle, and Overman searched her vehicle without consent. Overman found what appeared to be cocaine in Herman's vehicle. Overman told Herman that she had just been seen leaving the Valdez residence and asked Herman if she obtained "that cocaine from Emilio," to which Herman responded, " 'Yeah.' " Herman was then arrested and placed into custody. Herman at no time made any comment regarding Patricia.

After stopping Herman and finding the suspected cocaine, Overman radioed other officers and directed them to enter and take custody of the Valdez residence. Overman testified that he believed impounding the Valdez house was necessary because of "how fast word travels when we're doing something like this." The officers entered the house, and within a few minutes Overman arrived and spoke with both Emilio and Patricia.

Overman told the Valdezes that the police were taking custody of their home while a search warrant was being obtained. Overman also informed the Valdezes that they were not under arrest, but they were not free to leave unless they would consent to "a full search of their person and any vehicle they wanted to take." Overman then left the premises to complete the affidavit for a search warrant.

Prior to the search warrant's arriving, Officer Stephen Bonds performed a sweep through the house to see if additional people were in the home. No other searching was conducted prior to the arrival of the warrant. However, during the initial sweep, Bonds did observe Patricia placing something underneath some clothes.

The affidavit in support of the search warrant which Overman prepared contained information that several informants, both citizen and otherwise, had indicated that Emilio was a cocaine dealer. These references dated back to January 1990, with the most recent occurring in January 1995. On January 31, an informant stated that he had recently observed certain activity at the Valdez residence and that "he knows a drug deal when he sees one, and this was a drug deal." Another recent reference was made by a person with drug charges who was considering working as a confidential informant. This informant stated on January 19, 1995, that he had personally purchased cocaine from Emilio at the Valdez residence within the past 3 months. All other references which related that Emilio was dealing cocaine occurred at least 1 year prior to the affidavit.

Only three reports mentioned Patricia. One stated that Patricia was engaged to Emilio. Another stated that Patricia was "really hooked on cocaine." The third reported that on April 13, 1990, police searched the home of Patricia and her then boyfriend and that Patricia testified during the trial of the boyfriend for possession of cocaine that cocaine found in the home actually belonged to her.

Other information contained in the affidavit concerned the frequent stops of the six suspects with drug backgrounds. The affidavit stated that each of the six had made stops at the Valdez residence within the 3 months prior to the affidavit. Although

many of these stops were "brief" stops which were indicative of drug deals, there was no evidence that any drug deals or illegal activity had taken place during these stops. The affidavit also included a recitation of Herman's stop and the fact that Herman admitted that the alleged cocaine had come from Emilio. Overman did not mention in the affidavit that Herman's stop was based on only the observation of her vehicle stopping at the Valdez home, nor did he note that he drew his gun during the stop. There was also nothing in the affidavit regarding the entry and impoundment of the Valdez residence or any information obtained as a result of that entry and impoundment.

A search warrant was signed by a judge and entered at approximately 6:37 p.m. By the time Overman returned to the Valdez house with the warrant, the Valdezes had been detained and their home impounded for approximately 1 hour 25 minutes. After Overman returned to the Valdez residence, Emilio was informed of his *Miranda* rights by Officer Patrick Rotert. Following Emilio's being given his *Miranda* rights, Overman told Emilio that the officers would be searching for drugs and asked him where they would find them. Emilio responded by pointing to the basement. Patricia was searched after the arrival of the warrant, but prior to her formal arrest. As a result of the search of Patricia, the officers found a small packet of cocaine in her jacket pocket.

Upon searching the basement, the officers found a scale, a plastic tray with a spoon, $310, a stack of square white papers, a plastic sandwich bag containing nine white paper bindles, a plastic bag containing three plastic bags each containing white powder, a plastic bag containing white powder, a chrome metal sifter, and a piece of plate glass with white powder on it. In addition, inositol was found in the same location where Bonds had observed Patricia putting something during his initial sweep through the house prior to the arrival of the warrant.

Emilio and Patricia were then formally placed under arrest. On March 20, 1995, Emilio was charged with possession of a controlled substance with the intent to manufacture, distribute, deliver, or dispense the controlled substance, in violation of § 28-416(1)(a), a Class II felony. On April 13, Patricia was charged with the same crime. In a first amended motion to sup-

press filed on May 26, Emilio sought to suppress any statements made by him and any and all items seized from his residence. On April 17, Patricia also filed a motion to suppress any statements or evidence against her because the statements and evidence were obtained in violation of her constitutional rights. Patricia then filed a supplemental motion to suppress on August 25, seeking the court to suppress evidence because the affidavit in support of the search warrant contained allegedly false statements. The court consolidated Emilio's and Patricia's cases on June 23.

A hearing on the motions to suppress was held on September 6, 1995. At the hearing, Overman, Bonds, and Rotert each testified and the deposition of Herman was entered into evidence, as well as several other exhibits. In a journal entry filed September 14, the court granted Emilio's oral motion to join in Patricia's supplemental motion to suppress and then took the matters under advisement.

In an order dated September 21, 1995, the court denied the motions to suppress. Specifically, the court found that any false statement contained in the affidavit in support of the search warrant was not material and that the search warrant was valid. The court also determined that the initial entry by the officers was illegal, but that the seizure of the premises was not illegal. Further, the court stated that although the initial entry was illegal, no information from that entry was utilized in obtaining a valid search warrant, and therefore " '[t]he valid warrant search was a "means sufficiently distinguishable" to purge the evidence of any "taint" arising from the entry.' " See *Segura v. United States*, 468 U.S. 796, 104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984).

A bench trial on the matter was held on November 16, 1995, upon a stipulated set of facts which preserved the Valdezes' objections to the evidence seized. Following the trial, the court found both Patricia and Emilio guilty of the charges against them. The court then ordered a presentence investigation report. On January 11, 1996, a sentencing hearing was held at which the court sentenced Patricia to 3 years' probation, which included 3 months' incarceration in the Scotts Bluff County Jail. On March 14, Emilio was sentenced to an indeterminate

term of 3 to 6 years' imprisonment. Both Emilio and Patricia now appeal. Because Emilio and Patricia basically assert the same errors, these appeals are considered together.

## II. ASSIGNMENTS OF ERROR

On appeal, the Valdezes both, in effect, argue that the district court erred by overruling their motions to suppress evidence.

## III. STANDARD OF REVIEW

A trial court's ruling on a motion to suppress, apart from determinations of reasonable suspicion to conduct investigatory stops and probable cause to perform warrantless searches, is to be upheld on appeal unless its findings of fact are clearly erroneous. In making this determination, an appellate court does not reweigh the evidence or resolve conflicts in the evidence, but, rather, recognizes the trial court as the finder of fact and takes into consideration that it observed the witnesses. *State v. Konfrst*, 251 Neb. 214, 556 N.W.2d 250 (1996). See *Ornelas v. United States*, 517 U.S. 690, 116 S. Ct. 1657, 134 L. Ed. 2d 911 (1996).

Regarding matters of law, an appellate court has an obligation to reach a conclusion independent of the decisions reached by the court below. *State v. Swift*, 251 Neb. 204, 556 N.W.2d 243 (1996).

## IV. DISCUSSION

We briefly digress to address our view of the effect of *State v. Konfrst, supra*, and *State v. Swift, supra*, on the appellate standard of review of a magistrate's probable cause determination to issue a warrant. *Swift* and *Konfrst* hold that apart from determinations of (1) reasonable suspicion to conduct investigatory stops and (2) probable cause to perform *warrantless* searches, a trial court's ruling on a motion to suppress is to be upheld on appeal unless its findings of fact are clearly erroneous. In those two instances, the ultimate determinations of reasonable suspicion to conduct investigatory stops and probable cause to perform warrantless searches are reviewed de novo and findings of fact are reviewed for clear error. *Id.*

*Konfrst* involved a *warrantless* search. *Swift* involved, in part, a determination of the sufficiency of an affidavit for a warrant. Several aspects of the present appeal involve whether the affi-

davit established probable cause for the issuance of the search warrant. Does the required de novo review of the determination of probable cause to perform *warrantless* searches also require such a review of probable cause determinations to issue a search warrant? *Swift* involved a search warrant. While the court cited *Konfrst*, the traditional rules pertaining to the sufficiency of an affidavit for a warrant were also reiterated in *Swift*. Included is the principle that "the after-the-fact scrutiny of the sufficiency of an affidavit should not take the form of de novo review." *Swift*, 251 Neb. at 210, 556 N.W.2d at 248. *Ornelas v. U.S., supra*, cited in both *Swift* and *Konfrst*, had this to say about the notion that a de novo review of a probable cause determination in a warrantless search context was inconsistent with the "great deference" paid to such determinations when reviewing a decision to issue a warrant:

> The Fourth Amendment demonstrates a "strong preference for searches conducted pursuant to a warrant," [*Illinois v. Gates*, 462 U.S. 213, 236, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983),] and the police are more likely to use the warrant process if the scrutiny applied to a magistrate's probable-cause determination to issue a warrant is less than that for warrantless searches. Were we to eliminate this distinction, we would eliminate the incentive.

*Ornelas v. U.S.*, 116 S. Ct. at 1663.

The Court in *Ornelas* went on to hold, however, that as a *general* matter, determinations of probable cause (and reasonable suspicion) should be reviewed de novo on appeal. In so doing, it drew no distinction between probable cause for warrantless searches versus probable cause for search warrants.

We believe a fair reading of *Swift*, *Konfrst*, and *Ornelas* leads to the conclusion that while determinations of probable cause to issue a warrant must be reviewed de novo on appeal, we must continue to afford great deference to the magistrate's determination; the question is whether, under the totality of the circumstances brought to the attention of the magistrate and by interpreting the affidavit in a commonsense and not a hypertechnical manner, the magistrate had a substantial basis for finding the existence of a fair probability that evidence of a

 

crime or contraband would be found. See, also, *State v. Detweiler*, 249 Neb. 485, 544 N.W.2d 83 (1996).

## 1. SEARCH WARRANT

The Valdezes argue that the court erred in overruling their motions to suppress evidence because the evidence was obtained pursuant to an invalid search warrant. In evaluating the validity of a search warrant, the duty of a reviewing court is to ensure that the magistrate issuing the warrant had a substantial basis for determining that probable cause existed. *State v. Swift*, 251 Neb. 204, 556 N.W.2d 243 (1996). In evaluating the showing of probable cause necessary to support the issuance of a search warrant, only the probability, and not a prima facie showing, of criminal activity is required. *Id.*

The Valdezes first assert that a majority of the information contained in the affidavit presented to the judge was stale. Indeed, much of the information came from informants whose reports dated as far back as 1990. With the exception of Herman's statement and the observation that known "drug users" were stopping at the Valdez home, the information contained in the affidavit came from various other informants, only two of whom made reports within the year prior to the affidavit alleging a drug deal took place. One of these "recent" references stated that Emilio had sold cocaine from his residence sometime within a 3-month period prior to January 1995, or, in other words, possibly as far back as 6 months before the affidavit was presented to the judge. The other recent reference, which was made on January 31, was to the effect that the informant knew a drug deal when he saw one, and what he saw at the Valdez residence was a drug deal. This informant, however, did not state that he actually saw drugs being exchanged, but only that it was his intuition based upon his own drug use that a drug deal was occurring. We find that the informant's intuition of a crime is not sufficient to establish his knowledge of criminal activity, and therefore this statement does not establish probable cause. See *State v. Swift, supra.*

As for the validity of the information which suggested that Emilio was involved in the sale of drugs during a period from 6 months to 5 years prior to the affidavit, we turn to *State*

*v. Reeder*, 249 Neb. 207, 543 N.W.2d 429 (1996). In *Reeder*, the court held that information in an affidavit regarding the defendant's alleged prior drug activities which dated 4 months to 10 years in the past was stale information and could not be used to support probable cause for a warrant. In so holding the court stated, " 'Proof of probable cause justifying issuance of a search warrant generally must consist of facts so closely related to the time of the issuance of the warrant as to justify a finding of probable cause at that time.' " *Id.* at 212, 543 N.W.2d at 433, quoting *State v. Hodge and Carpenter*, 225 Neb. 94, 402 N.W.2d 867 (1987). We likewise find that the information detailing Emilio's alleged drug activities dating 6 months to 5 years prior to the affidavit was not so closely related to the time of the issuance of the warrant as to justify a finding of probable cause at the time.

The remaining information contained in the affidavit, again with the exception of that obtained from Herman's stop, consists of the observation that people with known drug backgrounds frequently stopped at the Valdez home. The Valdezes argue that the fact that people with drug backgrounds stop at their house does not create probable cause for the issuance of a warrant. To support this contention, the Valdezes cite *State v. Hernandez*, 242 Neb. 78, 493 N.W.2d 181 (1992). *Hernandez* involved testimony that persons previously arrested for narcotics violations were seen going to the defendant's house. The court held that the potential for such testimony to unfairly prejudice the defendant outweighed its probative value. The court then ruled that it was erroneous for the trial court to receive this evidence, but that it was a harmless error under the circumstances. While the court in *Hernandez* found that this information was not admissible, it did not rule that it could not be used to establish probable cause for a warrant.

The information in this case consisted of the fact that six persons with "known narcotics associations" were seen making frequent stops at the Valdez residence. Of these six people, however, only two were said to have been convicted of or charged with narcotics violations. The violation of one of those consisted of a charge of marijuana possession dating back to 1973. The information regarding the other suspects was a com-

bination of informant information and details such as that some of the suspects had at one time dated people with narcotics convictions. While we do not hold that frequent stops by known drug offenders can never establish probable cause sufficient to indicate that a defendant is dealing drugs, we find that the information contained in this affidavit is too tenuous to establish the required probable cause. We therefore find that this information did not establish that either Emilio or Patricia was dealing drugs.

The only other information in the affidavit concerns Herman's stop and her statement thereafter which confirmed that she had obtained cocaine from Emilio. The Valdezes assert that Herman's statement did not establish probable cause because the State failed to set forth facts which showed Herman's reliability and the basis of her knowledge.

When a search warrant is obtained on the strength of an informant's information, the affidavit in support of the issuance of the warrant must (1) set forth facts demonstrating the basis of the informant's knowledge of criminal activity and (2) establish the informant's credibility, or the informant's credibility must be established in the affidavit through a police officer's independent investigation. *State v. Swift*, 251 Neb. 204, 556 N.W.2d 243 (1996); *State v. Reeder*, 249 Neb. 207, 543 N.W.2d 429 (1996). Generally, there are four methods of establishing the reliability of an informant: (1) The informant has given reliable information to police officers in the past, (2) the informant is a citizen informant, (3) the informant has made a statement that is against his or her penal interest, or (4) a police officer's independent investigation establishes the informant's reliability or the reliability of the information the informant has given. *State v. Swift, supra*; *State v. Detweiler*, 249 Neb. 485, 544 N.W.2d 83 (1996).

In this instance, the record shows that the police stopped and searched Herman and found what appeared to be cocaine in her automobile. Before the substance was determined to be cocaine, Herman admitted that she got the "cocaine" from Emilio. As was stated in *State v. Utterback*, 240 Neb. 981, 989, 485 N.W.2d 760, 768-69 (1992), "An admission by an informant that he or she participated in the crime about which the

informant is informing carries its own indicia of reliability, since people do not lightly admit a crime and place critical evidence of that crime in the hands of police." It is clear that by admitting the substance was in fact cocaine, Herman made a statement against her penal interest, as possession of cocaine is itself a crime. See § 28-416(3). Therefore, we find that the affidavit established Herman's credibility.

Furthermore, we find that the affidavit set forth facts demonstrating the basis of Herman's knowledge of criminal activity. According to the affidavit, Herman was seen making a brief stop at the Valdez residence. Shortly thereafter, Herman's vehicle was stopped and searched, and suspected cocaine was found inside the vehicle. Herman then admitted that she obtained the "cocaine" from Emilio. We conclude that under the totality of the circumstances, the underlying affidavit established probable cause to search the Valdez house and Emilio. See *State v. Detweiler, supra.*

Patricia asserts that even if the affidavit established probable cause to search the Valdez residence and Emilio, it failed to establish probable cause for the search of her person which disclosed a packet of cocaine. Specifically, Patricia asserts that the affidavit contained no allegations which would make it probable that she was involved in any criminal activity.

The most recent reference in the affidavit to Patricia concerned an incident approximately 1 year old, with another being almost 5 years old. As we have already determined, this information was stale and did not establish probable cause to implicate her. Moreover, the recent stops at her home by drug suspects did not establish probable cause particularized with respect to Patricia, nor did Herman's statement, which made no reference to Patricia. The affidavit did, however, establish that Patricia was a joint occupant of the premises, that is, that it was the residence of Emilio and Patricia and that Emilio and Patricia were married. Thus, it reasonably established that the residence was in the custody or control of Emilio and Patricia, and the search warrant expressly so states. The affidavit also establishes Patricia's general familiarity with cocaine, the substance which Herman stated she had just obtained from Emilio at the residence.

A search and seizure of a person must be supported by probable cause particularized with respect to that person. *Ybarra v. Illinois*, 444 U.S. 85, 100 S. Ct. 338, 62 L. Ed. 2d 238 (1979). See *State v. Farrell*, 242 Neb. 877, 497 N.W.2d 17 (1993). Probable cause for a search and seizure of a person is not necessarily established by probable cause to search the premises where he or she happens to be. See, e.g., *Ybarra v. Illinois, supra*.

As noted by the State, *Ybarra v. Illinois, supra*, is not directly applicable to Patricia's search because in *Ybarra* the defendant, unmentioned in the affidavit for the warrant, was searched merely because he was present on the premises for which a search warrant had been issued. Here, the affidavit specifically referenced Patricia. Moreover, unlike in *Ybarra*, we are dealing with a private residence out of which a drug sale had just occurred and with premises which were under the control and dominion of the person searched. Finally, unlike in *Ybarra*, the search warrant here specifically authorized the search of Patricia.

The question presented is whether the affidavit established probable cause to search Patricia's person, that is, whether it was sufficient to establish a fair probability that contraband would be found on Patricia's person. The issuing judge obviously determined that the affidavit established such probable cause. Based upon the "totality of the circumstances," see *State v. Detweiler*, 249 Neb. 485, 544 N.W.2d 83 (1996), and paying "great deference" to the issuing judge's determination, see *State v. Swift*, 251 Neb. 204, 556 N.W.2d 243 (1996), we conclude that such determination was correct.

Alternatively, and distinct from the warrant, we believe the search of Patricia was a valid search incident to a lawful arrest. That the search occurred before she was formally arrested is not, under the facts here, of consequence. It has been held that a search incident to an arrest can be made prior to an arrest as long as probable cause for the arrest exists prior to the search. *State v. Twohig*, 238 Neb. 92, 469 N.W.2d 344 (1991); *State v. Roach*, 234 Neb. 620, 452 N.W.2d 262 (1990). It does not matter that a defendant is not formally placed under arrest until after a search, so long as the fruits of the search are not neces-

sary to support the cause to arrest. *State v. Roach, supra.* When a law enforcement officer has knowledge, based on information reasonably trustworthy under the circumstances, which justifies a prudent belief that a suspect is committing or has committed a crime, the officer has probable cause to arrest without a warrant. *Id.*

We have already concluded that the affidavit was sufficient to establish a fair probability that cocaine or illegal drugs would be found in the Valdez residence. As stated above, the affidavit also established that Patricia had dominion or control over this residence, along with Emilio. A defendant's control or dominion over the premises at which contraband is located may establish the defendant's constructive possession of the contraband. *State v. DeGroat*, 244 Neb. 764, 508 N.W.2d 861 (1993). Thus, the affidavit was sufficient to establish probable cause to believe that Patricia was in possession of cocaine, a crime. Therefore, the affidavit established probable cause for her arrest for the crime of possession of cocaine, and thus, probable cause existed prior to Patricia's search. The cocaine packet found on Patricia was not necessary to support the probable cause for her arrest. Therefore, even if the affidavit did not establish probable cause to search Patricia, the search was valid as one incident to Patricia's lawful arrest.

We also note that Herman's stop and the search of her vehicle were of questionable constitutionality. Even if the stop was a valid *Terry* stop, there was no consent to the search, and probable cause to search her vehicle is not apparent from our record. This scenario is rendered even more egregious in that it was part of a carefully orchestrated plan. However, despite the potential illegality of this conduct, the Valdezes lack standing to complain of it, as neither the stop nor the search was directed toward either of them. See *United States v. Shovea*, 580 F.2d 1382 (10th Cir. 1978). While we certainly do not condone the activity of the officers in this instance, we cannot find that it has an effect on the Valdezes' appeals.

## 2. ENTRY AND IMPOUNDMENT

The Valdezes next contend that the court erred by not sustaining their motions to suppress, since the police both illegally

entered and impounded their home prior to obtaining the search warrant. According to the Valdezes, the evidence obtained and used against them should have been suppressed as fruits of the poisonous tree under *Wong Sun v. United States,* 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). The State asserts, on the other hand, that the entry and impoundment were warranted by exigent circumstances. Moreover, the State contends that even if the entry and impoundment were illegal, none of the information obtained as a result was used in securing the search warrant, and thus the evidence was obtained from an independent source.

### (a) Entry

It is a recognized principle of law that a police officer who has obtained neither an arrest warrant nor a search warrant cannot make a nonconsensual and warrantless entry into a suspect's home in the absence of exigent circumstances. See, *State v. Plant,* 236 Neb. 317, 461 N.W.2d 253 (1990); *State v. Resler,* 209 Neb. 249, 306 N.W.2d 918 (1981). In the absence of a warrant, it is the State's burden to prove that the search was conducted under circumstances substantiating the reasonableness of the search or seizure. *State v. Plant, supra.*

The State asserts that exigent circumstances existed in this instance because of the likelihood that the Valdezes would have destroyed evidence before a search warrant could have been obtained. Specifically, the State argues that this threat existed because the Valdezes could have easily been warned of Herman's stop, since several people were starting to gather around the area where Herman was stopped, including Herman's boyfriend, and because the stop occurred only five or six blocks from the Valdez home. According to Overman, "word travels like crazy" in that particular neighborhood. However, despite this knowledge, the record shows it was the officers' choice to stop Herman in such close proximity to the Valdez residence. We note that exigency created by an officer's unreasonable investigative strategy cannot justify the officer's warrantless entry into the defendant's home. See *U.S. v. Duchi,* 906 F.2d 1278 (8th Cir. 1990). However, regardless of the State's arguments, the lower court found that this initial entry was ille-

gal, a determination which the State takes no exception to on this appeal.

### (b) Impoundment

The State argues that even if the initial entry was illegal, the impoundment of the house was legal to secure against the destruction of evidence. In this regard, the State cites *Segura v. United States*, 468 U.S. 796, 104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984). In *Segura*, the Court held in a split decision that

> where officers, having probable cause, enter premises, and with probable cause, arrest the occupants who have legitimate possessory interests in its contents and take them into custody and, for no more than the period here involved [19 hours], secure the premises from within to preserve the status quo while others, in good faith, are in the process of obtaining a warrant, they do not violate the Fourth Amendment's proscription against unreasonable seizures.

468 U.S at 798.

In *Segura*, the police arrested the defendant in the lobby of his apartment building for selling drugs. The police then went to the defendant's apartment, arrested his roommate, and impounded the apartment for 19 hours while the officers attempted to obtain a search warrant. The Court held that under the circumstances the impoundment was not illegal, but the initial entry into the apartment may have been. Regardless, the Court held, "The illegal entry into petitioners' apartment did not contribute in any way to discovery of the evidence seized under the warrant," 468 U.S. at 815, and therefore "[t]he valid warrant search was a 'means sufficiently distinguishable' to purge the evidence of any 'taint' arising from the entry," 468 U.S. at 814. See, also, *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963).

The Valdezes assert that their situation is distinguishable from that in *Segura*. Indeed, in this instance, unlike in *Segura*, the officers did not formally arrest the Valdezes until after they obtained the warrant and searched the premises. Therefore, Emilio and Patricia arguably had more of a possessory interest in their house than did the petitioners in *Segura*, who had been

placed under arrest and were in custody during the impound-
ment. In fact, the Valdezes were not free to leave their home
during the impoundment without first consenting to a full
search of their persons and their vehicles.

Moreover, in *Segura*, there was a strong possibility that evi-
dence would have been destroyed or removed had the apartment
not been impounded, since the defendant's roommate was wait-
ing for him to return and may have become suspicious had he
not returned within the 19 hours it took to get a search warrant.
Here there is no evidence that the Valdezes would have had any
cause for concern if Herman did not return to their home within
the time it took to secure the warrant. As stated previously, any
exigency created by "word" spreading to the Valdezes concern-
ing Herman's arrest was created by the officers' actions in stop-
ping Herman within the Valdezes' neighborhood.

However, even if the impoundment was illegal under these
circumstances, the record shows that the affidavit used to obtain
the search warrant did not include any information acquired as
a result of the entry or the impoundment. In *Wong Sun v. United
States,* 371 U.S. at 487-88, the Court held:

> We need not hold that all evidence is "fruit of the poi-
> sonous tree" simply because it would not have come to
> light but for the illegal actions of the police. Rather, the
> more apt question in such a case is "whether, granting
> establishment of the primary illegality, the evidence to
> which instant objection is made has been come at by
> exploitation of that illegality or instead by means suffi-
> ciently distinguishable to be purged of the primary taint."

See, also, *State v. Evans,* 223 Neb. 383, 389 N.W.2d 777 (1986).

The "independent source" rule was first enunciated in
*Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.
Ct. 182, 64 L. Ed. 319 (1920), and was later followed and
refined in *Nardone v. United States,* 308 U.S. 338, 60 S. Ct.
266, 84 L. Ed. 307 (1939), and *Wong Sun v. United States,
supra.* The crux of the "independent source" rule is that even if
there is illegal police conduct, evidence should not be excluded
"if the connection between the illegal police conduct and the
discovery and seizure of the evidence is 'so attenuated as to dis-
sipate the taint.'" *Segura v. United States,* 468 U.S. 796, 805,

104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984), quoting *Nardone v. United States, supra.* As was explained in *State v. Evans, supra:*

> An analysis of *Silverthorne*, *Nardone*, and *Wong Sun* discloses that the Court was considering evidence *actually* discovered by two entirely independent investigative activities—one illegal, the other legal. The two independent and linear investigations actively converged and concluded in the actual production of some evidence. Therefore, under the "independent source" rule, if the lines of investigation are entirely independent, police misconduct will not taint the evidence otherwise obtained by proper police investigation.

223 Neb. at 391, 389 N.W.2d at 783.

In this instance, it is clear that none of the information contained in the affidavit was acquired as a result of either the entry or the impoundment. Therefore, even if both the entry and the impoundment of the Valdez home were illegal, the evidence would have been discovered regardless through the legal means of the search warrant. As the Court stated in *Segura v. United States*, 468 U.S. at 815, "our cases make clear that evidence will not be excluded as 'fruit' unless the illegality is at least the 'but for' cause of the discovery of the evidence. Suppression is not justified unless 'the challenged evidence is in some sense the product of illegal governmental activity.' " Here the illegal entry and the impoundment, if it was in fact illegal, did not contribute to discovery of the evidence seized under the warrant.

It is arguable that the inositol which was found in an area where Bonds observed Patricia placing something during the protective sweep should be suppressed because it was observed before the warrant was issued. However, we have found the search of the premises to have been lawful, and its discovery pursuant to that search is therefore lawful. Moreover, as is obvious from the amount of evidence seized, this was but one piece of evidence which indicated that the Valdezes were involved in selling cocaine. The rest of the evidence Bonds testified he did not observe during his initial sweep of the house. Because the majority of the evidence was seized as a result of the legal search warrant and completely independent of the illegal entry or the impoundment, we find no error in the court's determina-

tion that the evidence should not be suppressed as fruit of the poisonous tree.

Finally, we note that in affirming the decision of the lower court, we do not condone the illegal search of Herman's car or the warrantless entry of the Valdez home. The manner in which the police conducted portions of this investigation shows a disconcerting lack of concern for the constitutional rights either of the Valdezes or of Herman. Justice Stevens, in his dissenting opinion in *Segura v. United States*, 468 U.S. at 839, said of the majority's holding:

> The Court's rhetoric cannot disguise the fact that when it not only tolerates but also provides an affirmative incentive for warrantless and plainly unreasonable and unnecessary intrusions into the home, the resulting erosion of the sanctity of the home is a "price" paid by the innocent and guilty alike.

While we find certain tactics of the police in this matter to be very troubling, we feel we have no other choice under the case law but to uphold the seizure of the evidence.

### V. CONCLUSION

We conclude that the search warrant for the residence, Emilio, and Patricia was valid because the affidavit established the requisite probable cause. Furthermore, even though the initial entry was illegal and even if the impoundment was likewise illegal, the information in the affidavit upon which the search warrant was issued had sources independent of that illegality. Thus, we conclude that the court did not err in overruling the motion to suppress.

AFFIRMED.

SIEVERS, Judge, concurring.

I concur in the result. However, I write separately to make clear what it is about the actions of the police officers in this case which troubles me, even though I have voted to uphold the convictions and agree with Judge Mues' well-reasoned and finely crafted opinion. These cases involve the trampling by police upon the constitutional rights of the "small fish" (Nancy Herman) in order to get the "big fish" (the Valdezes). The record shows that even if Herman was properly stopped for

investigation purposes under *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), her vehicle was searched unlawfully—the search was not for weapons for officer safety. Instead it was a preplanned search undertaken by Officer Overman, who had contemplated and understood, but did not care about, its basic illegality. The purpose of the search of Herman's vehicle—to get the "big fish"—has been accomplished, but our affirmance of the convictions is evidence only of our obligation to adhere to precedent from higher courts. Such adherence is fundamental to a coherent and efficient judicial system. Nonetheless, when police officers plan and scheme to ignore the constitutional rights of a citizen under a "the end result justifies the means" mentality, then our most basic freedoms are at risk. The job of the police in our democratic society is bigger than just convicting "big fish" drug dealers. It also involves respecting and protecting the constitutional freedoms of all citizens. That the police set out to do the opposite in order to obtain a conviction is what troubles me.

INBODY, Judge, joins in this concurrence.