STATE OF NEBRASKA, APPELLEE, V.
ANDREW TOMPKINS, APPELLANT.

710 N.W.2d 654

Filed February 28, 2006.    No. A-05-212.

Brian J. Lockwood, Deputy Scotts Bluff County Public Defender, for appellant.

Jon Bruning, Attorney General, and Kimberly A. Klein for appellee.

IRWIN, SIEVERS, and MOORE, Judges.

IRWIN, Judge.

## I. INTRODUCTION

Andrew Tompkins appeals from his convictions and sentences for distribution of a controlled substance on or near a playground, possession of a firearm while in violation of Neb. Rev. Stat. § 28-416(1) (Cum. Supp. 2004) (making it unlawful to, inter alia, knowingly or intentionally distribute a controlled substance), and possession of drug paraphernalia. Tompkins contends that the district court erred in failing to sustain his supplemental motion to suppress and his motion for new trial. While we find that the affidavit in support of the search warrant at issue in this case was inadequate to support a finding of probable cause as to Tompkins, we hold that a good faith exception to the suppression rule applies, and therefore, we affirm.

## II. BACKGROUND

Det. Mark Overman of the Scottsbluff Police Department, who was assigned to a drug crime investigation unit, received an anonymous tip regarding possible drug trafficking at a duplex located in Scottsbluff, Nebraska. The duplex was divided into an upstairs and a downstairs unit, each of which had a separate entrance. The separate entrance for the upstairs apartment, occupied by Jacob Snow, was located at the front of the house, with steps leading to it from the main sidewalk. The separate entrance for the downstairs apartment, occupied by Tompkins, was located by the driveway and had a set of stairs and a railing. Additionally, a common entrance may have existed on the side of the house.

There are differing accounts of when that first tip was provided to Overman, but Overman received the tip "sometime [in] late June or in July [2004]." The first anonymous tipster (Citizen No. 1) contacted Overman by telephone "five or seven" times from the time of the first tip until "sometime in August" and had initially "called for information on what signs to look for [of criminal activity because she] believed there was some type of drug activity going on [at the duplex]."

Citizen No. 1 provided Overman with the name of the upstairs tenant in the duplex, Snow. Overman instructed Citizen No. 1 to "try to get license plate numbers from . . . vehicles," and Citizen

No. 1 subsequently provided several license plate numbers from vehicles that had stopped at the duplex. At the time of Citizen No. 1's deposition in November 2004, she had destroyed her record of the license plate numbers. Overman testified at the suppression hearing, "Some of the license plate numbers [belonged] to people that had drug intelligence with the [drug crime investigation u]nit and some did not."

Citizen No. 1 submitted that visitors entered both the upstairs and downstairs apartments of the duplex, but that she did not count or have knowledge of how many people visited Tompkins' downstairs apartment. Citizen No. 1 believed that one visitor was a family member of one of the duplex residents.

Citizen No. 1 provided an account of an incident which occurred at her home on July 21, 2004, where a woman mistakenly came to her door looking for "Paula." Citizen No. 1 informed her that "Paula did not live there." The woman "disagreed with [Citizen No. 1, saying] that she was at the right house," and asked Citizen No. 1 whether she "would sell her a dime bag." Citizen No. 1 informed the woman that "they," perhaps referring to Paula and others, "hang out at Jake's house." We assume that the reference made by Citizen No. 1 to "Jake's house" is alluding to the residence of Snow. Citizen No. 1 reported to Overman that the woman left her door and headed toward the duplex. However, Citizen No. 1 did not watch the woman walk into the residence and therefore did not report to Overman which door the woman may have entered.

Based on the reports of Citizen No. 1, Overman began an independent investigation of Snow and Tompkins. Overman contacted a representative of the duplex's landlord in order to confirm the ownership of the duplex and the identity of the tenants. Overman did not ascertain whether there was a common door to the two units in addition to the separate entrance to each.

Overman's independent investigation included surveillance of the duplex. On one occasion, Overman conducted what he described as "real surveillance," having "[a]ctually [spent] some time watching the place"; Overman also drove by the duplex for surveillance purposes approximately "a dozen" times. Overman's "real surveillance" consisted of parking near the duplex and observing activity there for "[t]wenty to 30 minutes," during which

he observed one vehicle arrive with two occupants. On the occasions when Overman simply drove by the duplex, he "never stopped and watched to see if there was stop and go traffic, but [he] would certainly see a number of cars parked there [and] people in and around the place."

While parked near the duplex conducting surveillance, Overman was approached by Citizen No. 2, who inquired about Overman's presence in the neighborhood. Overman informed Citizen No. 2 that he was conducting surveillance on the duplex. Citizen No. 2 reported to Overman that "there was a lot [of] in and out traffic, that there were a lot of stop and go people running in and out, that there appeared to be a bouncer at the door [of the duplex]." Citizen No. 2 indicated that he thought there was a bouncer because "[someone] was meeting a person on the front lawn [and] had a golf club and seemed to greet people as if he were — keeping them from the front door, keeping them from going in." He specified that the bouncer "was on the steps or in the front yard."

On another occasion, Citizen No. 2 notified Overman of an incident where a person "had driven down the street, passed the [duplex], parked on another street, walked back to the [duplex], was there for 10 to 15 minutes, left and walked back up the other street." Citizen No. 2 reported the license plate number of this person's vehicle to Overman.

Citizen No. 2 also reported that he had seen four vehicles stop at the duplex during a 20-minute time period, "pull[ing] up [to the duplex] facing the wrong way in the street." "[T]he passenger would run inside . . . the house and then come back out 10 or 15 minutes later." When asked whether these visitors entered through the front door, which leads to Snow's upstairs unit, Citizen No. 2 replied that he had seen one person go through that door and was unable to see or recall where the other visitors entered the house.

On August 20, 2004, as part of Overman's independent investigation, he collected the garbage that had been placed on the duplex's curb for regularly scheduled pickup. Overman accompanied the driver of an empty city refuse collection truck to the duplex, where one garbage receptacle had been placed out for collection. The contents of the collected garbage were at least

three separate bags containing garbage, two of which were separately attributable to Snow and Tompkins through venue items within, and garbage that was not separated into bags but loose in the garbage receptacle.

On August 26, 2004, Overman requested the issuance of a search warrant through an "Affidavit in Support of Search Warrant." Overman's affidavit contained a paragraph of background information describing his training and experience with the Scottsbluff Police Department, specifically with drug investigation and drug law enforcement, and a paragraph describing the duplex and relating the fact that its two separate units were occupied individually by Snow and Tompkins. Other pertinent portions of the affidavit are detailed below.

On the same date, a search warrant was issued and subsequently executed. The warrant authorized a search of Snow, Tompkins, their vehicles, and the duplex property for " 'marijuana, drug related paraphernalia, scales, monies that are the result of marijuana sales, packaging material, police scanners, firearms, records of transactions of marijuana purchases and records of contacts with persons that sell or purchase marijuana.' "

On September 2, 2004, the State filed an information charging Tompkins with one count of distribution of a controlled substance on or near a playground, one count of possession of a firearm while in violation of § 48-416(1), and one count of possession of drug paraphernalia. The charges against Tompkins were based on evidence and statements obtained as a result of the search of his residence and a finding that his residence was located within 1,000 feet of a school.

On October 1, 2004, Tompkins filed a motion to suppress all evidence seized and statements obtained as a result of the August 26 search. In a supplemental motion to suppress he filed on October 21, Tompkins alleged that in seeking the search warrant, "[Overman] made a deliberate falsehood and/or acted with reckless disregard for the truth" and that "omissions in the affidavit used to obtain the search warrant [were] misleading because the facts contained in the omitted material tend[ed] to weaken or damage the inferences which [could] logically be drawn." Tompkins made 19 arguments in support of suppression, including arguments that "[Overman] did insufficient investigation and did not

set forth in his affidavit what specific door the 'stop and go' traffic was going into" and that "[t]he information was skewed in an attempt to establish probable cause for both the upstairs and downstairs apartments, when in fact if there was probable cause at all, it was for the upstairs apartment."

On December 23, 2004, the court held a hearing on Tompkins' supplemental motion to suppress. Tompkins asserted that the court must "look at [the affidavit in support of the search warrant] a second time to determine if there's probable cause for one apartment versus the other apartment." He maintained that the garbage collected in Overman's investigation must be sorted out to determine which garbage belonged to each tenant. Additionally, he challenged the reliability of the citizen informants.

After hearing the evidence, the court denied Tompkins' supplemental motion to suppress. A bench trial was conducted on January 5, 2005, on stipulated facts, at which time Tompkins preserved objections based on the "Fourth and Fourteenth Amendment[s to the U.S. Constitution] and article 1, Section 7 [of the Nebraska Constitution] as to the illegality . . . of the search and statements made . . . ." Thereafter, the court found Tompkins guilty of all three charges. The court sentenced Tompkins to a term of 24 to 48 months' imprisonment, less 2 days' credit for time served, for count I; to a consecutive term of 6 to 12 months' imprisonment for count II; and to pay a fine of $100 for count III. Tompkins timely appeals from these convictions and sentences and from the court's denial of a motion for new trial filed by him on January 14, 2005.

## III. ASSIGNMENTS OF ERROR

On appeal, Tompkins contends, restated, that the district court erred in denying his supplemental motion to suppress evidence and in denying his motion for new trial.

## IV. ANALYSIS

### 1. Standard of Review

A trial court's ruling on a motion to suppress evidence, apart from determinations of reasonable suspicion to conduct investigatory stops and probable cause to perform warrantless searches, is to be upheld on appeal unless its findings of fact are clearly

erroneous. *State v. Lykens*, 13 Neb. App. 849, 703 N.W.2d 159 (2005). In making this determination, an appellate court does not reweigh the evidence or resolve conflicts in the evidence, but, rather, recognizes the trial court as the finder of fact and takes into consideration that it observed the witnesses. *Id.* However, to the extent questions of law are involved, we as an appellate court have an obligation to reach conclusions independent of the decisions reached by the courts below. See *State v. Swift*, 251 Neb. 204, 556 N.W.2d 243 (1996).

## 2. SUFFICIENCY OF AFFIDAVIT

Tompkins expressly contends that the district court erred in overruling his supplemental motion to suppress and, thus, impliedly contends that the warrant to search his place of residence was invalid, because (1) the portions of the affidavit relating to Tompkins were insufficient to support a finding of probable cause and (2) the warrant was obtained, in part, on the strength of anonymous tips, but the informants' reliability was not established.

A search warrant, to be valid, must be supported by an affidavit which establishes probable cause. *State v. March*, 265 Neb. 447, 658 N.W.2d 20 (2003). In evaluating the validity of a search warrant, the duty of a reviewing court is to ensure that the magistrate issuing the warrant had a substantial basis for determining that probable cause existed. *State v. Swift, supra.* Probable cause sufficient to justify issuance of a search warrant means a fair probability that contraband or evidence of a crime will be found. *State v. March, supra.*

In reviewing the strength of an affidavit submitted as a basis for finding probable cause to issue a search warrant, an appellate court applies a "totality of the circumstances" test. *Id.* The question is whether, under the totality of the circumstances illustrated by the affidavit, the issuing magistrate had a substantial basis for finding that the affidavit established probable cause. *Id.* In evaluating the sufficiency of an affidavit used to obtain a search warrant, an appellate court is restricted to consideration of the information and circumstances contained within the four corners of the affidavit, and evidence which emerges after the warrant is issued has no bearing on whether the warrant was validly issued. *Id.*

Our review of the record reveals that the trial court's factual determinations were not clearly erroneous. In addition, the motion to suppress was properly overruled despite the fact that the "Affidavit in Support of Search Warrant" was legally insufficient to support a finding of probable cause to search Tompkins and his residence. Suppression of the evidence is not an appropriate remedy in this case because police acted in objectively reasonable good faith reliance on the warrant.

(a) Independent Investigation: Garbage Pickup

In challenging the sufficiency of the affidavit, Tompkins argues that there is no nexus between the garbage recovered in Overman's independent investigation and Tompkins' activities. The State asserts that "whether the trash from both apartments was intermixed is immaterial, given that the incriminating evidence would relate to one or the other places/persons [sic] to be searched." Brief for appellee at 13. We disagree and find that probable cause had to be found as to each unit and each resident of the duplex. The garbage collected in Overman's investigation did not support a finding of probable cause as to Tompkins.

When a structure is divided into more than one residential unit, or where two residences are located on a single parcel of property, there must be cause to search each unit. *United States v. Whitten*, 706 F.2d 1000 (9th Cir. 1983). The U.S. Supreme Court held in *Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S. Ct. 338, 62 L. Ed. 2d 238 (1979), that the requirement that a search or seizure of a person be supported by probable cause "particularized with respect to that person" could not be "undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another [person]." Implicit within the concept of probable cause is the notion that the government may pursue multiple, perhaps even divergent, lines of investigation so long as the government establishes probable cause *as to each suspect* prior to the issuance of any warrant. *U.S. v. Moody*, 762 F. Supp. 1491 (Ga. 1991).

In the instant case, the affidavit details what Overman found in his search of the garbage. Specifically, the affidavit states:

On August 20, 2004, [Overman] rode with an empty City of Scottsbluff Environmental Services Department truck, and

picked up the trash container that was located in the front of [the duplex] in Scottsbluff, Scotts Bluff County, Nebraska. [Overman] states that this was a small plastic trash container intended for that residence. The driver dumped the trash at a city facility so officers could search it.

. . . During the search of the container, [Overman] and [another detective of the drug crime investigation unit] located the following items:

1) Inside a plastic bag, officers found a partial "Paper Mate" pen barrel with a white residue inside. [Overman] has seen similar items many times, used to ingest powdered controlled substances[.] Officers also found an empty envelope addressed to [Tompkins at the duplex]. The return address on the envelope is "Office of the County Attorney, Box Butte County, PO Box 660, Alliance NE 69301.["] The envelope was postmarked on August 4, 2004.

2) Inside another plastic bag, officers found an empty, fold top plastic baggie with marijuana residue, a broken glass pipe with marijuana residue, and a "savings withdrawal" form from First State Ban[k], Scottsbluff, dated 6-15-04 in the name of . . . Snow, [addressed to Snow at the duplex, and] containing the signature of . . . Snow.

3) Inside another plastic bag, officers found a piece of notebook paper with two hand drawn marijuana leaves, and two phrases, "Smoke Weed Everyday," and "Bud Smokers Only," also large, bold numbers "4:20" and the words "Fire it up" directly beneath the numbers. [Overman] knows through training and experience that "weed" and "bud" are two slang terms for marijuana. [Overman] also knows that the term "4:20" is a slang term among drug users, particularly marijuana users, that encourages smoking marijuana. There was also a small amount of marijuana inside this plastic bag.

4) Officers also located a portion of a marijuana plant, approximately 12 inches long by 8 inches wide. This item was loose inside the trash container.

In *State v. Shock*, 11 Neb. App. 451, 653 N.W.2d 16 (2002), a police investigator's assertions in the affidavit submitted in support of a search warrant—inter alia, that individuals engaged in

methamphetamine production often discard fruits of their efforts into trash bags, that officers examining trash attributable to the suspects in the case found discarded coffee filters and aluminum foil containing residue, and that those officers found numerous syringes and empty suphedrine boxes—were insufficient to support a determination of probable cause to believe that the suspect had committed, or was committing, methamphetamine offenses, where the affidavit failed to show how any items found in the trash were used to manufacture methamphetamine.

In the instant case, the only garbage material that can be directly attributed to Tompkins is that contained in the bag which included an envelope addressed to him by name. As was the case with the affiant officer's assertions in *State v. Shock, supra,* Overman's assertions in the affidavit in this case that he found a pen barrel with a white residue inside and has seen similar items used to ingest powdered controlled substances were insufficient to support a determination of probable cause to believe that marijuana offenses had been or were being committed, where the affidavit in this case failed to show how the pen barrel found in the trash was used in commission of such offenses.

Additionally, the garbage contained in the bag that included an envelope addressed to Snow by name cannot reasonably be attributed to Tompkins.

The garbage that was not connected to either tenant through venue items or any other indicia of ownership or possession does not create a substantial basis for determining that probable cause existed as to Tompkins. While it may be considered as part of the overall "totality of the circumstances," such garbage does not individually or collectively with other evidence give rise to a finding of probable cause.

In *State v. Jackson,* 937 P.2d 545 (Utah. App. 1997), the Court of Appeals of Utah considered whether garbage collected from the appellants' curb could be affirmatively attributed to the appellants. The appellants argued that the contraband found in the garbage could have been placed in the garbage receptacles by strangers or neighbors. *Id.* The court determined that based on venue items included in the garbage, the contraband could be affirmatively attributed to the appellants rather than to a passerby or neighbor. *Id.*

█ In the instant case, we find that the garbage that was loose in the garbage receptacle or contained in bags without venue items or other indicia of ownership could have been placed there by someone other than Tompkins, namely Snow. Such garbage can be attributed to *either* Tompkins or Snow, and as such, we cannot affirmatively attribute it to either. As noted above, while such garbage may be considered under the totality of the circumstances, we find that it does not individually or collectively with other evidence create a substantial basis for finding that probable cause existed as to Tompkins.

### (b) Criminal Record

Tompkins reminds us that in reviewing "the strength of [the] affidavit submitted as a basis for finding probable cause to issue a search warrant," we must apply the " 'totality of the circumstances' rule." Brief for appellant at 13. The State asserts that in addition to assessing the trash contents and information from citizen informants, Overman's independent investigation included researching the criminal history of Snow and Tompkins. However, the criminal history, as it related to Tompkins, was insufficient to support a finding of probable cause or suggest that evidence of a crime would be found in his residence.

As previously stated, in reviewing the strength of an affidavit submitted as a basis for finding probable cause to issue a search warrant, an appellate court applies a "totality of the circumstances" test. *State v. March*, 265 Neb. 447, 658 N.W.2d 20 (2003). The question is whether, under the totality of the circumstances illustrated by the affidavit, the issuing magistrate had a substantial basis for finding that the affidavit established probable cause. *Id.*

█ Proof of probable cause justifying issuance of a search warrant generally must consist of facts so closely related to the time of issuance of the warrant as to justify a finding of probable cause at that time. *State v. Lee*, 265 Neb. 663, 658 N.W.2d 669 (2003); *State v. Groves*, 239 Neb. 660, 477 N.W.2d 789 (1991). However, whether the proof satisfies this test is determined by the circumstances of each case. *State v. Groves, supra.*

The affidavit contains two paragraphs relating to Tompkins' criminal history. The affidavit reads:

[Overman] states that according to Scottsbluff Police Department records . . . Tompkins was arrested for [driving under the influence of alcohol or drugs] on February 1, 2004. [Overman] states that a search of the vehicle Tompkins was driving yielded a small amount of marijuana and drug paraphernalia. However, a passenger in the vehicle was charged with the drug violations, and Tompkins was not.

[Overman] states that according to Scottsbluff Police Department records . . . Tompkins was charged with possession of drug paraphernalia on April 12, 2004.

■ In a similar case where an affidavit in support of a search warrant was presented to a magistrate requesting search warrants for more than one residence, the Court of Appeals of Oregon found in *State v. Johnson*, 186 Or. App. 186, 62 P.3d 861 (2003), that the information in the affidavit as it related to two of the appellants was insufficient to establish probable cause. In its analysis, the court determined that information regarding a prior drug conviction of one of those appellants, information 8 years old, was stale. In addition, the court found that the conviction, which was for possession of less than 1 ounce of marijuana, was not enough reason "to infer that, because [that appellant] previously ha[d] possessed less than an ounce of marijuana, [h]e probably [wa]s engaged in the production of marijuana." *Id.* at 193, 62 P.3d at 864. Supporting its contention, the court noted that an important factor to be considered in determining whether evidence is stale is the character of the crime or the thing to be seized. *Id.*

The fact that Tompkins was arrested for driving under the influence of alcohol or drugs and a passenger in his vehicle was charged with drug violations 6 months prior to the submission of the affidavit in this case does not make it probable that Tompkins would have presently possessed controlled substances. See, *State v. March*, 265 Neb. 447, 658 N.W.2d 20 (2003); *State v. Swift*, 251 Neb. 204, 556 N.W.2d 243 (1996). Likewise, a charge for possession of drug paraphernalia 4 months prior to the submission of the affidavit in this case does not bolster the circumstances to support a finding that contraband or evidence of a crime would be found. See, *People v. Rodriguez*, 303 A.D.2d 783, 758 N.Y.S.2d 172 (2003) (finding that search warrant was

issued without probable cause where allegation of criminal activity contained in application for search warrant was stale inasmuch as it was based on single purchase of cocaine which occurred 28 days prior to search); *State v. Jackson*, 937 P.2d 545 (Utah App. 1997) (determining upon review of affidavit that prior criminal conviction of appellant constituted stale and irrelevant information which should not have been considered by magistrate in making probable cause determination).

In the instant case, we must consider the character of the previous crimes alleged in the affidavit. That Tompkins was arrested for driving under the influence of alcohol or drugs and charged with, but not necessarily convicted of, possession of drug paraphernalia is less than persuasive that Tompkins would be involved in marijuana distribution. Additionally, Tompkins' criminal history was not so closely related to the time of the issuance of the search warrant as to justify a finding of probable cause at the time of such issuance. See, *State v. Lee*, 265 Neb. 663, 658 N.W.2d 669 (2003); *State v. Groves*, 239 Neb. 660, 477 N.W.2d 789 (1991); *State v. Valdez*, 5 Neb. App. 506, 562 N.W.2d 64 (1997).

### (c) Citizen Informants

Tompkins argues that the affidavit offered in support of the search warrant failed to establish probable cause because it did not establish the reliability or veracity of the informants. The State contends that the information provided by Citizen No. 1 and Citizen No. 2 was not the sole means of establishing probable cause, but was only a starting point for Overman's investigation. As such, the State asserts, the informants' reliability did not have to be conclusively established. Even if we were to assume that Tompkins' argument is without merit and that the reliability of the informants was established by the informants' being "citizen informants," the information they provided is neither individually nor collectively with other evidence sufficient to establish probable cause.

An appellate court is not obligated to engage in an analysis which is not needed to adjudicate the case and controversy before it. *In re Interest of Anthony P.*, 13 Neb. App. 659, 698 N.W.2d 457 (2005).

The affidavit in support of the search warrant contains five paragraphs outlining information relevant to the citizen informants and detailing the information they provided to Overman. We refer the reader to the background section of this opinion, which details information provided by the citizen informants.

The citizen informants' information, certainly alone, fails to show that contraband could be found at the duplex. When combined with the fact that there was excessive "stop and go" traffic seen at the duplex and Overman's testimony that some duplex visitors "had drug intelligence with the [drug crime investigation u]nit," the citizen informants' information does not provide more than a reasonable suspicion—not probable cause—that contraband could be found in Tompkins' residence.

The results of Overman's independent investigation, combined with the information from the citizen informants, do not separately or collectively with other evidence create a substantial basis for determining that probable cause existed or suggest with fair probability that contraband or evidence of a crime would have been found. See, *State v. March*, 265 Neb. 447, 658 N.W.2d 20 (2003); *State v. Swift*, 251 Neb. 204, 556 N.W.2d 243 (1996). Therefore, Tompkins' assignment of error has merit.

### 3. GOOD FAITH RELIANCE

Even though we have determined that the affidavit lacked a substantial basis for determining that there was probable cause as to Tompkins to support issuance of the search warrant, we must still consider whether the evidence obtained as a result of the warrant is admissible pursuant to the good faith exception to the search warrant requirement. See *State v. Shock*, 11 Neb. App. 451, 653 N.W.2d 16 (2002). The parties did not argue whether the police acted in good faith reliance in executing the search warrant, but we, sua sponte, address this issue and determine that the good faith exception applies in this case. As such, the motion to suppress was properly overruled.

The U.S. Supreme Court, in *United States v. Leon*, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984), examined the question of whether evidence should be allowed in a prosecution's case in chief when such evidence was obtained by officers acting in reasonable reliance on a search warrant issued by a

detached and neutral magistrate but ultimately found to be unsupported by probable cause. The Court considered the deterrent effect the exclusionary rule would have on law enforcement if "the offending officers acted in the objectively reasonable belief that their conduct did not violate the Fourth Amendment." *United States v. Leon*, 468 U.S. at 918. The Court concluded that the exclusionary rule should not be applied to deter objectively reasonable law enforcement activity. *United States v. Leon, supra.*

▪ Therefore, even in the absence of a valid affidavit to support a search warrant, evidence seized pursuant to the warrant need not be suppressed where police acted in objectively reasonable good faith reliance upon the warrant. See, *id.*; *State v. Johnson*, 256 Neb. 133, 589 N.W.2d 108 (1999).

Suppression would remain an appropriate remedy if (1) the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his or her reckless disregard for the truth; (2) the issuing magistrate wholly abandoned his or her judicial role in the manner condemned in *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 99 S. Ct. 2319, 60 L. Ed. 2d 920 (1979); (3) the warrant is based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or (4) the warrant is so facially deficient—such as in failing to particularize the place to be searched or the things to be seized—that the executing officer cannot reasonably presume it to be valid. *United States v. Leon, supra*; *State v. Davidson*, 260 Neb. 417, 618 N.W.2d 418 (2000); *State v. Edmonson*, 257 Neb. 468, 598 N.W.2d 450 (1999). If none of the aforementioned circumstances exist, then the evidence should not be suppressed. *Id.*

▪ In assessing the good faith of an officer's conducting a search pursuant to a warrant, an appellate court must look to the totality of the circumstances surrounding the issuance of the warrant, including information not contained within the four corners of the affidavit. *State v. Davidson, supra*; *State v. Edmonson, supra.*

▪ When evaluating whether a warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable, an appellate court

should address whether the officer, considered as a police officer with a reasonable knowledge of what the law prohibits, acted in objectively reasonable good faith in relying on the warrant. *State v. Davidson, supra; State v. Edmonson, supra.* See *United States v. Leon, supra* (indicating that standard of objective reasonableness requires officer executing warrant to have reasonable knowledge of what law prohibits).

In order to dispose of this appeal, it is necessary to consider whether the good faith exception is properly applied to these circumstances.

There is no evidence that the judge was misled by information in the affidavit that Overman knew was false or would have known was false except for reckless disregard for the truth on his part, no evidence that the judge wholly abandoned his judicial role, and no evidence that the warrant was so facially deficient that the officers executing it could not have reasonably presumed it to be valid. Therefore, the only remaining question is whether the warrant was based on information so lacking in indicia of probable cause as to render a law enforcement officer's belief in its existence entirely unreasonable.

Overman is a well-trained police officer. Overman details in the affidavit his extensive training, including "training and experience in the investigation of drug offenses and crimes of violence" and "training through the Nebraska Law Enforcement Training Center, Nebraska State Patrol, National College of District Attorneys, [and] Drug Enforcement Administration." Overman further states that he has "a B.A. degree in Criminal Justice" and "graduated from the FBI National Academy in 1995." It is reasonable to conclude that based on his experience and training, Overman has a reasonable knowledge of what the law prohibits.

Overman offered facts that would lead a well-trained police officer to believe that contraband or evidence of a crime would likely be found at the duplex. He was careful to separate in the affidavit the information that was provided by the informants and information obtained upon his subsequent investigation, indicating that he believed that the informants' allegations of illegal activity occurring at the duplex were corroborated by his own investigation. In the affidavit, Overman stated that he "kn[ew]

through training and experience that a large amount of brief stop and go traffic is often indicative of drug trafficking."

Lastly, we note that at the time of the issuance of the search warrant in this case, no Nebraska jurisprudence directly on point existed regarding a salient issue of first impression in the present case: whether, in the context of facts such as those of the present case, an affidavit in support of a search warrant for multiple individuals and multiple residential units contains a substantial basis for determining that there is probable cause specific to one of those individuals. We cannot conclude that a law enforcement officer who had reasonable knowledge of what the law required regarding probable cause relating to multiple suspects and multiple residential units would, at the time of the execution of the search warrant in this case, have been unreasonable in relying in good faith on the warrant issued by the magistrate in this case.

Additionally, the information Overman presented to the issuing judge was not completely devoid of indicia of probable cause, and such information, viewed as a whole, arguably supports the conclusion that there was a fair probability that evidence of illegal drug activity would be found at Tompkins' and Snow's residences. See, *United States v. Leon*, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984); *State v. Davidson*, 260 Neb. 417, 618 N.W.2d 418 (2000); *State v. Edmonson*, 257 Neb. 468, 598 N.W.2d 450 (1999). Therefore, we conclude that there was an objectively reasonable basis for believing that the warrant was valid.

### 4. MOTION FOR NEW TRIAL

Because our resolution of Tompkins' first assignment of error is dispositive of this appeal, we need not consider his remaining assignment of error. See *In re Guardianship of D.J.*, 268 Neb. 239, 682 N.W.2d 238 (2004). An appellate court is not obligated to engage in an analysis which is not needed to adjudicate the case and controversy before it. *In re Interest of Anthony P.*, 13 Neb. App. 659, 698 N.W.2d 457 (2005).

## V. CONCLUSION

Although we conclude that the search warrant used to obtain evidence upon which Tompkins was convicted was not based on an affidavit with sufficient indicia of probable cause as to

Tompkins, we hold that the officers who executed the warrant acted with objectively reasonable good faith. Hence, we affirm.

AFFIRMED.