STATE OF NEBRASKA, APPELLANT, V. LEVISIT EVANS, APPELLEE.
389 N.W.2d 777

Filed July 3, 1986.   No. 85-951.

Donald L. Knowles, Douglas County Attorney, and Robert C. Sigler, for appellant.

James Martin Davis, for appellee.

SHANAHAN, J.

Pursuant to Neb. Rev. Stat. § 29-824 (Reissue 1985), the State of Nebraska appeals the judgment of the district court for Douglas County suppressing evidence seized while searching Levisit Evans. The judgment of the district court is affirmed.

In determining the correctness of a trial court's ruling on a motion to suppress evidence, the Supreme Court will not overturn the trial court's findings of fact unless such findings are clearly erroneous. See *State v. Dixon*, 222 Neb. 787, 387 N.W.2d 682 (1986). In reviewing the correctness of the findings of fact made by a trial court regarding a motion to suppress, the Supreme Court recognizes and takes into consideration that the trial court has observed witnesses testifying regarding the motion to suppress, has determined credibility of the witnesses, and has weighed testimony from those witnesses to reach findings of fact regarding such motion. See, *State v. Dixon, supra*; *State v. Walmsley*, 216 Neb. 336, 344 N.W.2d 450 (1984).

A confidential source informed the narcotics unit of the Omaha Police Department about illicit transactions involving

controlled substances in Omaha. On June 18, 1985, officers of the narcotics unit arranged a "controlled purchase" of heroin, that is, police, after verification that an informant was not carrying a controlled substance, gave purchase money to the informant, observed their informant buy the heroin, and obtained the purchased contraband when the informant returned to the police. As a result of the controlled purchase on June 18, officers identified the narcotics seller as Charles Boney Walker, whom the police had previously observed numerous times driving a silver Oldsmobile.

Based on their informant's tip that Walker would be at a lot behind some commercial buildings, in midafternoon on June 19 narcotics officers arranged a second controlled purchase during their 45-minute surveillance of the lot. Police observed several people coming and going from a silver Oldsmobile parked in that lot. As a result of the second controlled purchase, the police informant identified Walker and one Johnny B. Johnson as individuals at the car parked in the lot. Without any warrant, eight officers entered the lot, observed three persons outside the silver Oldsmobile, found Walker in the driver's seat of the car, and saw Evans attempting to get out of the vehicle's right front seat. Police had no prior identification of Evans and were unaware that he was one of the individuals in the lot. One officer saw Walker try to hide "something" under the car's front seat, but the officers, for the sake of safety as well as to discover contraband, proceeded to search Evans, Walker, and the three individuals found outside the Oldsmobile.

Evans, wearing a jogging outfit, including tennis shoes and a jacket, was "spread eagle" against the Oldsmobile as one narcotics officer commenced a "pat down" for weapons. The search disclosed that Evans was carrying no weapon. However, in the course of the "pat down" the officer felt a "large packet" in the pocket of Evans' jacket, extracted the packet, which was transparent plastic and contained 16 tinfoil packets believed by the officer to contain heroin, and arrested Evans for possession of heroin. In relating the sequence of events, the arresting officer testified: "The packet was taken out of his pocket prior to him being placed under arrest. When I felt it, it was removed and placed on the car." At that point, according to the officer,

Evans was placed under arrest. A test later confirmed that the tinfoil packets contained heroin. The search in question and arrest were the only law enforcement activity regarding Evans. There was no investigative undertaking by police concerning Evans before the encounter on June 19.

Evans filed a motion to suppress physical evidence obtained as a result of the search, claiming that the questioned search was conducted in violation of Evans' constitutional guarantee against an unreasonable search. See, U.S. Const. amend. IV; Neb. Const. art. I, § 7. After a hearing on Evans' motion, the district court found that police officers, on approaching the automobile in the lot, had intended only to "pat down" Evans for weapons, and further found that "[a]lthough a pat down for weapons and a brief detention would have been permissible, an immediate intrusion into the pocket of the defendant upon feeling a substance which was not suspected of being either a weapon or contraband was not." The court specifically held that the doctrine of "inevitable discovery" was not applicable to preserve admissibility of the evidence obtained during the police search of Evans.

The State does not contend that discovery of heroin on Evans was justifiable and produced admissible evidence as the result of a *Terry*-type search. See *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968) (an investigatory detention based on articulable suspicion of criminal activity and subsequent discovery of a weapon during a "pat down" or "frisk").

Rather, the State contends that the trial court committed two errors in suppressing evidence obtained from Evans: (1) Failure to find that Evans was under arrest and, therefore, the search producing the evidence was an incident to that arrest; and (2) Failure to apply the doctrine of "inevitable discovery." Review in this case is, therefore, limited to the two theories advocated by the State for constitutional admissibility of physical evidence obtained from Evans.

An exception to the warrant requirement for seizure and arrest of a person was recognized in *Carroll v. United States*, 267 U.S. 132, 158, 45 S. Ct. 280, 69 L. Ed. 543 (1925): "When a man is legally arrested for an offense, whatever is found upon

his person or in his control which it is unlawful for him to have and which may be used to prove the offense may be seized and held as evidence in the prosecution."

As further explained in *Chimel v. California*, 395 U.S. 752, 762-63, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969):

> When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. . . . In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction.

A valid search as an incident to an arrest without a warrant necessarily depends on the legality of the arrest itself. As provided in Neb. Rev. Stat. § 29-404.02 (Reissue 1985): "A peace officer may arrest a person without a warrant if the officer has reasonable cause to believe that such person has committed" a felony or misdemeanor under certain conditions not applicable to the present case. The key to a lawful arrest without a warrant is "reasonable" or probable cause that a person has committed a crime.

In *State v. Harding*, 184 Neb. 159, 164, 165 N.W.2d 723, 726 (1969), this court stated: "It is not necessary that an actual formal arrest occur before a search is undertaken as long as probable cause for arrest does exist prior to the search." In *Harding* we pointed out that the constitutional issue regarding a reasonable search, as an incident of a felony arrest without a warrant, depends upon the presence or absence of probable cause for that arrest, that is, whether immediately before the search an officer has probable cause to believe that the person to be searched has committed a felony.

"[P]robable cause to arrest exists at the moment when the facts and circumstances within an officer's knowledge and of which he has reasonably trustworthy information are sufficient to warrant a man of reasonable caution to believe that an offense has been or is being committed." *State v. Harrison*, 218 Neb. 532, 535, 357 N.W.2d 201, 204 (1984). See, also, *Brinegar v. United States*, 338 U.S. 160, 69 S. Ct. 1302, 93 L. Ed. 1879 (1949).

However, as pointed out in *Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S. Ct. 338, 62 L. Ed. 2d 238 (1979):

> [A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person. *Sibron v. New York*, 392 U.S. 40, 62-63. Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be.

See *Sibron v. New York*, 392 U.S. 40, 62-63, 88 S. Ct. 1889, 20 L. Ed. 2d 917 (1968) ("The inference that persons who talk to narcotics addicts are engaged in the criminal traffic in narcotics is simply not the sort of reasonable inference required to support an intrusion by the police upon an individual's personal security. Nothing resembling probable cause existed until after the search had turned up . . . heroin. . . . [A]n incident search may not precede an arrest and serve as part of its justification.").

Before finding Evans in the lot, police had never identified Evans and had no information indicating that Evans would be present or implicated in any unlawful transaction involving heroin or any other controlled substance. As the officers approached the vehicle in the lot, there was no factual basis for concluding that Evans was criminally trafficking in any controlled substance. Therefore, at the time of the encounter on June 19, the police officers knew nothing in particular about Evans except that he was present with others, in a lot, when police believed that Walker was about to sell or was selling a controlled substance. Probable cause to arrest is not some vapor permeating a place, engulfing anyone who happens to be at a site where unlawful conduct may be occurring or may have occurred. Rather, probable cause to arrest is particularized and exists in reference to a specific individual. The district court in this case concluded that there was not a factual basis "sufficient to warrant a man of reasonable caution" to connect Evans, by his mere presence, to illicit trafficking in any controlled

substance. In that posture, the district court determined that the police lacked probable cause to arrest Evans and, therefore, any search of Evans was not an incident to a lawful arrest. The record does not compel the conclusion that the district court's finding is clearly erroneous.

In advocating admissibility of the evidence obtained from Evans' person, the State relies on the "Christian burial" case, *Nix v. Williams*, 467 U.S. 431, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984). In *Nix*, after the victim-child disappeared on December 24, 1968, physical evidence found the next day led to issuance of a warrant on December 25 for Williams' arrest. On December 26 police initiated a large-scale search for the victim's body in a specific area. Meanwhile, Williams surrendered to authorities in Davenport, Iowa. Police officers, returning Williams from Davenport to Des Moines, had informed Williams' lawyer that Williams would not be questioned during transportation to Des Moines. En route, one of the officers exhorted Williams to "locate the body [because] the parents of this little girl should be entitled to a Christian burial for the little girl who was snatched away from them on Christmas [E]ve and murdered. . . ." *Id.* at 435. Williams agreed to direct officers to the child's body. On account of Williams' cooperation and prospective direction to the child's body, at 3 p.m. on December 26 police temporarily suspended the search which had commenced at 10 a.m. that day. Williams led police to the child's body in a culvert, a site within the search area and within $2^{1}/_{2}$ miles of a methodically approaching search team which would have discovered the body in 3 to 5 hours if the search had not been suspended in view of Williams' cooperation.

In adopting the "ultimate or inevitable discovery exception to the exclusionary rule," *id.* at 441, the U.S. Supreme Court held: "If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means—here the volunteers' search—then the deterrence rationale has so little basis that the evidence should be received." *Id.* at 444.

> [I]f the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the

police, there is no rational basis to keep that evidence from the jury in order to ensure the fairness of the trial proceedings. . . . [W]hen . . . the evidence in question would inevitably have been discovered without reference to the police error or misconduct, there is no nexus sufficient to provide a taint and the evidence is admissible.

*Id*. at 447-48.

Actually, the first mention of inevitable discovery seems to have occurred in *Somer v. United States*, 138 F.2d 790 (2d Cir. 1943), when Judge Learned Hand indicated that contraband, illegally obtained, might still be admissible if the government produced evidence that

quite independently of [tainted or illegal evidence], the officers *would have gone to the street*, have waited for [the defendant] and have arrested him, exactly as they did. If [the government] can satisfy the court of this, so that it appears that [the officers] did not need the information, the seizure may have been lawful. [Proceedings remanded to retry the issue of validity for the seizure in question.].

(Emphasis supplied.) *Id*. at 792.

Would the physical evidence taken from Evans' person inevitably have been discovered without reference to the police error or misconduct, namely, the unlawful arrest, in conjunction with the search of Evans? The answer lies in a characterization of an inevitable discovery of the evidence in question.

Before the advent of "inevitable discovery" as a doctrine applicable to admissibility of evidence affected by investigative misconduct or error by police, the "independent source" rule was spawned and first enunciated in *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392, 40 S. Ct. 182, 64 L. Ed. 319 (1920), where the Court stated:

Of course this does not mean that the facts thus obtained became sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it [simply because it is used derivatively].

Later, in *Nardone v. United States*, 308 U.S. 338, 341, 60 S. Ct.

266, 84 L. Ed. 307 (1939), the Court held that the police misconduct, once established, entitled "the accused to prove that a substantial portion of the case against him was a fruit of the poisonous tree," but recognized "[s]ophisticated argument may prove a causal connection between information obtained through illicit wire-tapping and the Government's proof. As a matter of good sense, however, such connection may have become so attenuated as to dissipate the taint." Almost 25 years after *Nardone*, in *Wong Sun v. United States*, 371 U.S. 471, 487-88, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963), the Court held:

> We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."

An analysis of *Silverthorne*, *Nardone*, and *Wong Sun* discloses that the Court was considering evidence *actually* discovered by two entirely independent investigative activities—one illegal, the other legal. The two independent and linear investigations actively converged and concluded in the actual production of some evidence. Therefore, under the "independent source" rule, if the lines of investigation are entirely independent, police misconduct will not taint the evidence otherwise obtained by proper police investigation.

The criterion for admissibility adopted in *Nix v. Williams*, 467 U.S. 431, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984), requires that the evidence ultimately or inevitably "*would have been discovered*," not "could have been discovered." As a result of *Nix v. Williams, supra*, the inevitable discovery doctrine varied somewhat and extended the previous independent source rule. *Nix* injected a hypothetical into the independent source rule: *If* the State shows by a preponderance of the evidence that, disregarding any police misconduct in obtaining the evidence in question, the disputed or controversial evidence *would have* been produced or obtained by proper police investigation

entirely independent of the illegal investigative conduct, then such evidence is admissible pursuant to the "inevitable discovery" doctrine. Distinguished from the "independent source" rule, "inevitable discovery" involves two lines of investigation, one tainted and the other lawful, but the lawful line of investigation is not consummated in production of evidence. However, by the requisite preponderance of evidence, the State must demonstrate that some lawful means of discovery, not an illegal investigation, would have produced the evidence in question, that is, such evidence inevitably would have been discovered without existence of any police misconduct. See Appel, *The Inevitable Discovery Exception to the Exclusionary Rule*, 21 Crim. L. Bull. 101 (1985).

In *United States v. Satterfield*, 743 F.2d 827 (11th Cir. 1984), law enforcement officers, investigating a kidnaping but without a search or arrest warrant, entered Satterfield's residence, took him into custody, placed him in a patrol car, and, after a 10-minute interval, reentered the unoccupied residence and discovered a shotgun used in the kidnaping under investigation. Several hours after discovering the shotgun during the warrantless search, police obtained a warrant authorizing a search of Satterfield's residence. The search warrant was obtained on the basis of information from the kidnap victim, not on information derived through the previous and warrantless search. The government contended that the police undoubtedly would have uncovered the shotgun during the search authorized by the valid warrant, and, therefore, the shotgun was admissible evidence. After determining that circumstances did not justify the officers' warrantless entry into Satterfield's residence to search for the shotgun, the court in *United States v. Satterfield, supra*, held at 846:

> The elements of the inevitable discovery rule [are:] To qualify for admissibility, there must be a reasonable probability that the evidence in question would have been discovered by lawful means, and the prosecution must demonstrate that the lawful means which made discovery inevitable were possessed by the police and were being actively pursued *prior* to the occurrence of the illegal

conduct. [Emphasis in original.] . . .

. . . .

. . . Here the Government had not yet initiated the lawful means that would have led to the discovery of the evidence. . . . [The Government] did not possess the legal means that would have led to the discovery of the shotgun. That means did not exist until several hours later when the warrant was obtained.

. . . [I]f evidence is obtained by illegal conduct, the illegality can be cured only if the police possessed and were pursuing a lawful means of discovery at the time the illegality occurred. [Citations omitted.] The Government cannot later initiate a lawful avenue of obtaining the evidence and then claim that it should be admitted because its discovery was inevitable.

The court in *United States v. Satterfield, supra*, required that the proper investigative activity be in existence and actively pursued before the misconduct occurs. Whether the proper investigation must exist before, may exist simultaneously, or occur after the misconduct is apparently an aspect of the inevitable discovery doctrine yet to be debated and decided. If truly independent of each other, the chronological sequence of the investigation, proper and improper, might well be irrelevant. However, as a practical matter, proper investigation preexisting any misconduct in another investigation does render the fact and existence of an independent investigation more concrete and easily established.

As an exception to the exclusionary rule, the "inevitable discovery" doctrine may be applied for admissibility of evidence only where the State demonstrates that the evidence in question inevitably would have been discovered during lawful police investigation without aid or benefit from police misconduct or error.

In Evans' case, however, there was no initiated and independent line of police investigation at the time the officers removed the evidence from Evans. Given an illegal arrest of Evans and unlike *Nix v. Williams*, 467 U.S. 431, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984), police in this case were not actively pursuing a lawful means which inevitably would have

led to discovery of evidence, when the officers obtained the questioned evidence from Evans. Without an existent and lawful investigatory activity independent of the unlawful police search of Evans, the inevitable discovery rule is unavailable to the State. Whatever could have been routine and lawful procedure in the situations existing in the present case is abject speculation and falls far short of satisfying the requirement that the prosecution must show the evidence would have been discovered by lawful means. The district court's ruling, as a matter of law, was correct.

> The inevitable discovery exception to the exclusionary rule is a logical extension of the doctrines of independent source and attenuation and can be a valuable addition to the criminal justice system. Courts can apply it in a way that protects the law enforcement interests of society, and also provides substantial deterrence of unlawful police activity and protection of the rights of criminal suspects. Inevitable discovery, however, must be applied with caution and discretion. A mechanical application of the doctrine will encourage unconstitutional shortcuts such as those taken by the Court in [*Nix v. Williams*]. The effectiveness and validity of the inevitable discovery doctrine as an exception to the exclusionary rule depends upon courts applying it in the future with greater care and in a more neutral fashion than courts have applied it in the past . . . .

Cohn, *Sixth Amendment—Inevitable Discovery: A Valuable but Easily Abused Exception to the Exclusionary Rule*, 75 J. Crim. L. & Criminology 729, 754 (1984).

"In carving out the 'inevitable discovery' exception to the taint doctrine, courts must use a surgeon's scalpel and not a meat axe." 3 W. LaFave, Search and Seizure § 11 at 624 (1978).

The district court findings and judgment, suppressing and excluding physical evidence obtained from Evans, are not clearly erroneous.

AFFIRMED.