STATE OF NEBRASKA, APPELLEE,
V. ANOUSONE SOUKHARITH, APPELLANT.
570 N.W. 2d 344

Filed November 14, 1997.    No. S-96-341.

Gregory A. Pivovar, Deputy Sarpy County Public Defender, for appellant.

Don Stenberg, Attorney General, and Kimberly A. Klein for appellee.

WHITE, C.J., CAPORALE, WRIGHT, CONNOLLY, GERRARD, and STEPHAN, JJ., and FAHRNBRUCH, J., Retired.

CONNOLLY, J.

Anousone Soukharith was convicted by a jury of first degree murder, kidnapping, robbery, and the use of a weapon to commit a felony. The district court for Sarpy County sentenced Soukharith to concurrent sentences of life in prison for murder and kidnapping, a concurrent term of 20 to 40 years' imprisonment for the robbery, and 10 to 20 years' imprisonment on the use of a weapon conviction, to be served consecutively. Soukharith appeals, asserting that the State of Nebraska lacked territorial subject matter jurisdiction, that his constitutional rights to be free of search and seizure under the 4th and 14th

Amendments were violated, and that the jury verdict was not supported by sufficient evidence. We affirm.

## I. ASSIGNMENTS OF ERROR

Soukharith asserts that the district court erred in (1) denying his plea in abatement concerning the jurisdiction of the district court, (2) denying his motion to suppress all statements and evidence resulting from the investigative stop in Wyoming, (3) finding that the evidence at the crime scene inevitably would have been discovered, (4) denying his motion to suppress the envelope and letter seized at the detention facility in Wyoming, and (5) finding that the evidence was sufficient to support the verdict.

## II. BACKGROUND

Karen Logsdon, a resident of Des Moines, Iowa, left her home around 7 a.m. on May 23, 1995, to drive her son to school and then go to work in a business she owned with her parents, Harold and Myrna Fluharty. She was driving a leased 1994 white Mitsubishi 3000 GT VR-4 sports car with Polk County, Iowa, license plates. Karen dropped her son off at school, but never arrived at her place of business. She was shot by Soukharith in Sarpy County, Nebraska, that day and died from the gunshot wound he inflicted.

Karen typically arrived at work by 8 a.m. Myrna was still at home on May 23, 1995, when she learned that Karen had not arrived at work at her usual time. Myrna was concerned, so she called Karen, who had a cellular phone in her vehicle. Karen answered the phone, but she was crying. When Myrna asked Karen if something was wrong, she replied that nothing was wrong and that she was on her way to work. Myrna then called Karen's husband, Gerald Logsdon. Gerald had talked to Karen a few minutes after 8 a.m., when she called him at their home. Karen's call was cryptic, and she sounded like she had been crying, which Gerald thought was odd. After Myrna talked to Gerald, she went to the family business and checked the voice mail. Karen, who still sounded like she was crying, had left a message saying she was going to Ames, Iowa. Karen had not mentioned going to Ames prior to leaving the message. Myrna called Gerald again because she knew Karen was missing.

Karen called Myrna for the last time at about 10:45 a.m. She told Myrna that she was leaving "here" at "a quarter after" and said "good-bye." That was Myrna's last contact with Karen.

After Gerald received Karen's telephone call at home and spoke with Myrna, he contacted a Lieutenant Jorgensen of the Polk County sheriff's office. At about 9:30 a.m., Jorgensen had a health and welfare stop put on Karen's vehicle. Jorgensen also contacted the Des Moines Police Department to start stolen car and missing person reports.

### 1. INVESTIGATIVE STOP

Karen's vehicle was stopped that day in Wyoming at approximately 6:30 p.m. by Trooper David Chatfield. Chatfield was eastbound on Interstate 80 when he observed a "fancy sports car" in the westbound lane, which was driven by a young man. Chatfield thought the fancy car and young driver seemed out of place, so he turned around and tailed the vehicle. While Chatfield was behind the vehicle, he called his dispatcher and had registration and National Crime Information Center (NCIC) checks performed on the vehicle's license plates. The dispatcher gave Chatfield a "caution message," because the NCIC response showed that there was a missing and endangered person connected with the vehicle. The dispatcher informed Chatfield that the missing person was Karen Logsdon and described her as a white female in her forties.

At this point, Chatfield pulled alongside the vehicle to see if anyone fitting the description of the missing person was inside. Chatfield could see only one person in the car, a male driver. Chatfield then dropped back behind the vehicle, turned on his cruiser's lights, and stopped the vehicle.

Chatfield retrieved the driver's license and registration. The registration indicated that the car was registered to Mitsubishi Motor Credit Corporation of America. Soukharith remained in the vehicle while Chatfield went back to his cruiser and called the dispatcher so they could check the validity of the license. While he was waiting for the dispatcher to make the check, Chatfield reapproached Soukharith and asked him if he owned the vehicle. Soukharith said yes he did and that he had bought the car from a "guy" named "Wonum" the previous day.

Chatfield then asked Soukharith whether he knew Karen Logsdon. Soukharith told Chatfield that Karen was Wonum's "stepmother." In response to further questioning, Soukharith said he had paid for the car with a $2,000 check and that he had the checkbook with him.

Chatfield did not look at the checkbook at this time. Instead, he returned to his cruiser to call for backup and to see if the dispatcher had any more information concerning the vehicle. The dispatcher told Chatfield that Soukharith's license was suspended. By this time, approximately 10 to 15 minutes had passed since the initial stop.

Upon learning that Soukharith's license was suspended, Chatfield approached Soukharith and took the keys to Karen's vehicle to prevent Soukharith from driving away. Chatfield then went back to his cruiser to wait for the backup and to write a citation for the suspended license. Chatfield estimated that it took anywhere from 10 to 20 minutes for his backup, a Trooper Novak, to arrive and that a total of about 25 minutes had passed from the initial stop to that point.

After Novak arrived, he and Chatfield approached the vehicle again. Chatfield told Soukharith that Chatfield was citing Soukharith for driving with a suspended license, which violation is punishable by a $400 fine in Wyoming, and that either Soukharith should come up with the money or Chatfield would take him to jail. Soukharith produced $400, but Chatfield told him there was still a problem with the registration that had to be cleared up. Chatfield then asked Soukharith if he would produce the checkbook he had used to buy the vehicle. Soukharith said "sure" and got the checkbook from the trunk and gave it to Novak. No check had been written from the checkbook since March 1995, nor had any check been written for $2,000.

Novak then asked Soukharith whether there were any drugs or weapons in the vehicle. Soukharith said there were not and gave the troopers permission to conduct a search. The troopers did a cursory search of the vehicle in an attempt to find some other proof of ownership, but did not find anything. They had Soukharith get back in the vehicle and returned to Chatfield's cruiser to see if the dispatcher had additional information from the Des Moines Police Department. The dispatcher informed

them that the Des Moines Police Department considered the vehicle stolen and wanted them to hold it and the driver. Chatfield and Novak arrested Soukharith for possession of a stolen vehicle, read him his *Miranda* rights, and placed him in Chatfield's cruiser. Chatfield estimated that the elapsed time from the initial stop to the point of arrest was about 35 to 40 minutes.

After Soukharith was arrested and placed in the cruiser, Novak apparently spoke to Soukharith about the contents of Karen's vehicle. After talking with Soukharith, Novak told Chatfield there was a .45-caliber handgun inside the vehicle. Chatfield seized the handgun immediately prior to conducting an inventory search of the vehicle, as prescribed by his patrol manual.

### 2. LOCATION OF CRIME SCENE

While Soukharith was in custody in Wyoming, he asked to speak to a lawyer. Nonetheless, no lawyer was present on the afternoon of May 24, 1995, when Albany County Sheriff Gary Puls went to the detention facility where Soukharith was being held and interrogated him. During the interrogation, Soukharith told Puls where Karen's body was located. Karen's body was discovered at the crime scene that same day.

At trial, several witnesses testified as to the location of the body and as to the location of certain witnesses in relation to the crime scene, using an aerial photograph. We note that none of the locations described in the testimony were marked by any witness on the aerial photograph. The lack of markings made it especially difficult for this court to determine from the record where the body and the witnesses were located, because the witnesses used varying terminology to describe the scene. Some witnesses spoke as though the Interstate runs east and west at the crime scene, and some spoke as though it runs north and south. Directions concerning the Platte River were likewise inconsistent. This confusion could have been avoided if the State had simply had its witnesses identify locations by making a mark on the aerial photograph. Nonetheless, despite the added difficulty, the record indicates that Karen's body was found some 400 feet south of I-80, just east of the Platte River bridge in the area of mile markers 427 and 428.

The body appeared to have been shot where it lay. A Federal Bureau of Investigation (FBI) agent testified that a shell casing found about 10 feet from Karen's body was fired from the hand-gun Chatfield retrieved from Karen's vehicle in Wyoming after Soukharith was arrested. Testimony was also given concerning various shoe impressions left at the crime scene. The physical size, pattern, and shape of the shoe impressions were consistent with shoes worn by Soukharith. No evidence was adduced as to whether or not these particular shoes left the impressions because they lacked sufficient random characteristics.

Marvin Winter, a truckdriver from Lake City, Iowa, placed Karen's vehicle near the crime scene on May 23, 1995. He testified that he saw a white Mitsubishi 3000 GT that morning while traveling westbound on I-80. He noticed the car because it was a "fancy sports car" and had Polk County, Iowa, license plates. He also noticed that the car had two occupants. A white female was driving, and a "dark-complected" man was the passenger. When the car reached the middle of the "big Platte River bridge" in Sarpy County, it slowed down to about 20 miles per hour. Winter had to change lanes rapidly to avoid hitting the car. Winter saw the same car again about 2:30 that afternoon near Kearney. At that time, only the male was in the car.

### 3. SEARCH AND SEIZURE OF ENVELOPE AND LETTER

On June 6, 1995, Deputy Sheriff Daniel Hudson was preparing Soukharith for transport from a Laramie County, Wyoming, detention facility to Sarpy County, Nebraska, when he found a sealed envelope among Soukharith's personal property. Where the sending address would be on the envelope there appeared "???"; the return address read "Soukharith." Hudson's suspicions were aroused because the envelope contained no address and had question marks on it, and because Soukharith had been put on "close watch" due to past suicide threats. Hudson thought the envelope might contain a suicide note. Rather than open the envelope himself, Hudson brought it to the attention of his superior, Lieutenant Patrick Branigan.

Branigan thought the question marks were intended to draw the attention of the authorities to the envelope. Branigan knew that Soukharith had been classified as a "high-risk" inmate based upon the severity of the crime, information that he was a

suicide risk, and alleged gang affiliations. Information concerning the suicide risk originally came from the FBI, whose agent had found a suicide note during his inventory of the car. Although Soukharith's high-risk status was terminated on May 28, 1995, Branigan was still concerned that Soukharith might commit suicide. Branigan also thought Soukharith might "go off," or try to escape, during the transfer, jeopardizing the safety of the officers involved. Branigan opened the envelope based on these concerns and found a handwritten letter inside, which he scanned for key words such as "escape," "death," or "kill." Branigan saw the word "sorry" and realized the letter might be a confession, so he turned it over to a Captain Jackson of the Sarpy County Sheriff's Department. The envelope and letter were introduced at trial. The letter stated in part:

> To: Family of Karen
> I'm sorry for your lost [sic] of a wife, mother and a friend. . . .
>
> /s/ Anousone Soukharith
>
> To: FBI
> . . . It was all (me.) I did it all myself no gangs no friends nobody at all. It was all I. . . .
>
> /s/ Anousone Soukharith
>
> To: My Family and Friends
> I'm so sorry if I have lied or hurt any of you and which I have [sic] I didn't mean too [sic]. . . . Remember me as the guy I once was not the devil I have become or what has happen [sic]. . . .
>
> /s/ Anousone Soukharith

(Emphasis in original.)

### III. STANDARD OF REVIEW

The clearly erroneous standard of review of a district court's determinations of reasonable suspicion to conduct an investigatory stop and probable cause to perform a warrantless search is no longer applicable. The clearly erroneous standard has now been supplanted by a two-stage standard in which the ultimate determinations of reasonable suspicion and probable cause are reviewed de novo and findings of fact are reviewed for clear error, giving due weight to the inferences drawn from those facts by the trial judge. *State v. Konfrst*, 251 Neb. 214, 556 N.W.2d 250 (1996).

A trial court's ruling on a motion to suppress, apart from determinations of reasonable suspicion to conduct investigatory stops and probable cause to perform warrantless searches, is to be upheld on appeal unless its findings of fact are clearly erroneous. In making this determination, an appellate court does not reweigh the evidence or resolve conflicts in the evidence, but, rather, recognizes the trial court as the finder of fact and takes into consideration that it observed the witnesses. *State v. Konfrst, supra.*

In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Pierce,* 248 Neb. 536, 537 N.W.2d 323 (1995).

## IV. ANALYSIS

### 1. TERRITORIAL SUBJECT MATTER JURISDICTION

Soukharith asserts that the State lacked jurisdiction over the robbery and kidnapping charges. More specifically, Soukharith argues that the State of Nebraska lacked territorial subject matter jurisdiction because there was insufficient evidence concerning whether those crimes occurred in this state. Soukharith properly raised this issue via a plea in abatement prior to trial. Because the jury convicted Soukharith of robbery and kidnapping, the State argues that any defect in the trial judge's ruling on the plea in abatement is cured. Any error in ruling on a plea in abatement is cured by a subsequent finding at trial of guilt beyond a reasonable doubt which is supported by sufficient evidence. *State v. Boppre,* 234 Neb. 922, 453 N.W.2d 406 (1990).

In the instant case, the jury was instructed on the elements of robbery and kidnapping. Specifically, the jury was instructed that it must find beyond a reasonable doubt that the offenses occurred in Sarpy County, Nebraska. As discussed later, there is sufficient evidence, if viewed most favorably to the State, that a reasonable jury could find that a robbery and kidnapping occurred in Sarpy County. Thus, if any error occurred at the preliminary hearing, it was cured by the jury verdict.

## 2. SEARCH AND SEIZURE

Soukharith claims that his Fourth Amendment rights were violated by the NCIC check of Karen's license plates conducted by Chatfield prior to the stop, by the initial stop itself, by the subsequent detention, and by the seizure of the handgun. When analyzing police-citizen contact under the Fourth Amendment, one must balance the need for government intrusion with the privacy interests of the individual. See *State v. Van Ackeren*, 242 Neb. 479, 495 N.W.2d 630 (1993).

### (a) NCIC Search

Soukharith argues that the intrusion required for Chatfield to perform an NCIC records check on Karen's license plates amounts to an investigatory stop, which requires a reasonable suspicion of criminal conduct. Soukharith relies on *Wilson v. State*, 874 P.2d 215 (Wyo. 1994). His reliance is misplaced. At issue in *Wilson* was "whether a brief detention for the purpose of completing a computerized warrants check is an unreasonable seizure." *Id.* at 223. Although *Wilson* does state that "a *seizure* to conduct a computerized identification check without reasonable suspicion is not permitted," (emphasis supplied) *id.* at 222, the holding indicates that without a seizure, no reasonable suspicion is required.

If there is no detention or seizure within the meaning of the Fourth Amendment to the U.S. Constitution, then the Fourth Amendment safeguard against an unreasonable seizure is not implicated in an encounter between a private citizen and a police officer. *State v. Twohig*, 238 Neb. 92, 469 N.W.2d 344 (1991). A seizure in the Fourth Amendment context occurs " 'only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' " *Id.* at 102, 469 N.W.2d at 351 (quoting *Michigan v. Chesternut*, 486 U.S. 567, 108 S. Ct. 1975, 100 L. Ed. 2d 565 (1988)).

It is axiomatic that without a seizure, reasonable suspicion is not required. Chatfield simply made an NCIC check. Chatfield did not turn on his cruiser's lights or pull alongside Soukharith prior to receiving the results of the check, and Soukharith continued to drive without interference while the check was con-

ducted. Clearly, Soukharith was free to leave under these circumstances. We conclude that no reasonable suspicion was necessary for Chatfield to conduct the check because Soukharith was not seized within the meaning of the Fourth Amendment, and thus, his Fourth Amendment rights were not implicated.

(b) Investigative Stop and Reasonable Suspicion

Soukharith also argues that the initial stop was unconstitutional because Chatfield did not have a reasonable suspicion that Soukharith had committed or was committing a crime.

> " '[P]olice can constitutionally stop and briefly detain a person for investigative purposes if the police have a reasonable suspicion, supported by articulable facts, that criminal activity exists, even if probable cause is lacking under the fourth amendment.' " . . . " 'Reasonable suspicion entails some minimal level of objective justification for detention, something more than an inchoate and unparticularized suspicion or "hunch," but less than the level of suspicion required for probable cause.' . . ."

(Citations omitted.) *State v. Bowers*, 250 Neb. 151, 159, 548 N.W.2d 725, 730 (1996) (quoting *State v. Childs*, 242 Neb. 426, 495 N.W.2d 475 (1993)). "Whether a police officer has a reasonable suspicion based on sufficient articulable facts requires taking into account the totality of the circumstances." *State v. Ellington*, 242 Neb. 554, 559, 495 N.W.2d 915, 919 (1993).

Soukharith argues that the dispatch report Chatfield relied on in making the stop was insufficient to support a reasonable suspicion because Chatfield did not observe any facts corroborating the report. It is clear that "[a] reasonably founded suspicion to stop a vehicle cannot be based solely on the receipt by the stopping officer of a radio dispatch to stop the described vehicle *without any proof of the factual foundation* for the relayed message." (Emphasis supplied.) *State v. Benson*, 198 Neb. 14, 17, 251 N.W.2d 659, 661 (1977). Accord *State v. Thompson*, 231 Neb. 771, 438 N.W.2d 131 (1989). However,

> if a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop to check identification,

to pose questions to the person, or to detain the person briefly while attempting to obtain further information. *United States v. Hensley*, 469 U.S. 221, 232, 105 S. Ct. 675, 83 L. Ed. 2d 604 (1985). See *State v. Micek*, 193 Neb. 379, 227 N.W.2d 409 (1975) (upholding stop made solely on basis of radio bulletin that was based on facts creating reasonable suspicion or probable cause). Thus, it is irrelevant whether an officer making a stop in reliance on a radio bulletin is aware of the factual foundation for the bulletin, so long as the factual foundation is sufficient to support a reasonable suspicion. See *United States v. Hensley, supra.* In the instant case, if the officers who put the information regarding Karen's vehicle into the NCIC system had articulable facts sufficient to support a reasonable suspicion, Chatfield could have made the stop on the basis of the NCIC results alone.

Jorgensen, the officer who originally assisted Gerald in putting out the health and welfare stop on the car and starting the missing person and stolen car reports, knew that Karen had not come to work that morning as she always did and also knew that Gerald and Myrna had received strange phone calls from Karen, which obviously indicated she was in some kind of distress. Although these facts would be sufficient to create a reasonable suspicion in the minds of Jorgensen and the Des Moines Police Department, we need not decide the issue on that basis alone. An investigative stop, like probable cause, is to be "evaluated by the collective information of the police engaged in a common investigation." *State v. Van Ackeren*, 242 Neb. 479, 500, 495 N.W.2d 630, 644 (1993). Prior to making the stop, Chatfield personally observed facts that supported the dispatcher's broadcast. The dispatcher told Chatfield there was a missing person associated with the vehicle and described that person's features. Before Chatfield made the stop, he pulled alongside Soukharith to see if a person fitting the missing person's description was inside the vehicle. He made the stop only after he determined that the alleged missing person was not present. Thus, Chatfield observed facts that clearly corroborated what the Des Moines Police Department knew. From our de novo review, we conclude that Chatfield had sufficient reasonable suspicion to make the initial stop.

## (c) Length of Investigative Stop

Soukharith next argues that the excessive length of the stop violated his Fourth Amendment rights. An investigative stop must be "'temporary and last no longer than is necessary to effectuate the purpose of the stop.'" *U.S. v. Finke*, 85 F.3d 1275, 1279 (7th Cir. 1996) (quoting *Florida v. Royer*, 460 U.S. 491, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983)). However, "'in distinguishing a true investigative stop from a *de facto* arrest, we must not adhere to "rigid time limitations" or "bright line rules" . . . .'" *State v. Van Ackeren*, 242 Neb. at 490, 495 N.W.2d at 638 (quoting *U.S. v. Hardy*, 855 F.2d 753 (11th Cir. 1988), *cert. denied* 489 U.S. 1019, 109 S. Ct. 1137, 103 L. Ed. 2d 198 (1989)). Relevant circumstances include the "'law enforcement purposes served by the detention, the diligence with which the police pursue the investigation, the scope and intrusiveness of the detention, and the duration of the detention.'" *Id.* Whether law enforcement purposes are being served depends upon whether the detention was likely to confirm or dispel the officer's suspicions quickly, and with a minimum of interference. *Id.*

According to Soukharith, the fact that the stop lasted a total of 34 to 45 minutes rendered it unconstitutional. We disagree. First, Chatfield retrieved Soukharith's license and registration and then called the dispatcher to conduct an NCIC check. Rather than constituting an undue delay, the NCIC check was most likely the least intrusive way to quickly confirm or dispel Chatfield's suspicions and to determine whether continued inquiry or detention was justified. See *U.S. v. Finke, supra* (holding that continued detention for purpose of conducting NCIC check is justified when suspicious activity is detected).

While he waited for the results of the NCIC check, Chatfield asked Soukharith whether he owned the vehicle. Soukharith told Chatfield that he had purchased what was obviously a new, expensive sports car for $2,000 from someone named Wonum, allegedly Karen's stepson. After hearing Soukharith's story, Chatfield learned from the dispatcher that Soukharith's license had been suspended and called for backup. At 'this point, approximately 10 to 15 minutes had passed since the initial stop, and another 10 to 20 minutes would pass before

Chatfield's backup arrived. Although it took additional time, waiting for backup was appropriate. Chatfield spent the time writing the suspended license citation. Furthermore, Soukharith's suspended license and rather implausible story raised further suspicions in Chatfield's mind that Soukharith had committed or was committing a crime. "[O]fficer safety concerns are legitimately heightened when suspicious activity is detected . . . ." *U.S. v. Finke*, 85 F.3d at 1280. Wyoming State Patrol procedure dictates that "where the person stopped is a suspected felon . . . the member shall radio for back-up and the stop shall not be made without back-up unless circumstances require." Furthermore, a police officer may take reasonable steps to ensure his personal safety and maintain the status quo during an investigative stop. *U.S. v. Brown*, 51 F.3d 131 (8th Cir. 1995). Chatfield acted reasonably in waiting for backup to arrive before proceeding with his investigation.

Approximately 10 to 20 minutes passed from the time backup arrived until Chatfield made the arrest. Immediately after backup arrived, however, Chatfield learned that Soukharith was willing and able to pay cash for the suspended license citation and that the checkbook with which Soukharith claimed to have purchased the car did not support his story. Once again, further questions were created in Chatfield's mind, requiring that the stop be prolonged and the scope enlarged. See *State v. Rodriguez*, 239 Conn. 235, 684 A.2d 1165 (1996) (holding that when further questions are created in officer's mind, investigative stop may be prolonged and its scope enlarged as circumstances require). The vehicle was then searched, but did not reveal anything concerning the ownership of the car and thus, did not act to dispel any suspicion. Chatfield would have been remiss in his duties had he let Soukharith go at this point. Returning to his cruiser and getting additional information from the dispatcher, which information resulted in Soukharith's arrest, was justified in this instance. See *State v. Micek*, 193 Neb. 379, 227 N.W.2d 409 (1975). Taking into account the totality of the circumstances, and giving due regard to the balance between Soukharith's Fourth Amendment rights and the importance of the governmental interests justifying the intrusion, we find from our de novo review that the length and scope of the investigative stop were within constitutional limits.

### (d) Arrest

Soukharith next argues that Chatfield did not have probable cause to make the warrantless arrest, rendering it unconstitutional. More specifically, Soukharith argues that there was no probable cause because Chatfield relied solely on the information from the dispatcher to make the arrest. As we indicated above, an officer may rely solely on a radio bulletin to make a stop or an arrest when the bulletin is supported by an adequate factual foundation. See, *United States v. Hensley*, 469 U.S. 221, 105 S. Ct. 675, 83 L. Ed. 2d 604 (1985); *Whiteley v. Warden*, 401 U.S. 560, 91 S. Ct. 1031, 28 L. Ed. 2d 306 (1971). Furthermore, probable cause is "evaluated by the collective information of the police engaged in a common investigation." *State v. Van Ackeren*, 242 Neb. 479, 500, 495 N.W.2d 630, 644 (1993). In the instant case, the combined information of the Des Moines Police Department and Chatfield was enough to create probable cause. The Des Moines Police Department knew that Karen had mysteriously disappeared. Chatfield confirmed that Karen was not in her vehicle when he stopped it in Wyoming. Soukharith, who was driving Karen's vehicle on a suspended license, could not support his rather implausible story concerning his acquisition of the vehicle. " 'When a law enforcement officer has knowledge, based on information reasonably trustworthy under the circumstances, which justifies a prudent belief that a suspect is committing or has committed a crime, the officer has probable cause to arrest without a warrant.' " *State v. Twohig*, 238 Neb. 92, 106, 469 N.W.2d 344, 354 (1991) (quoting *State v. Blakely*, 227 Neb. 816, 420 N.W.2d 300 (1988)). In our de novo review, we find these facts are sufficient to justify a prudent belief that Soukharith had committed or was committing a crime, giving rise to probable cause to make the arrest.

### (e) Search of Vehicle and Seizure of Handgun

Soukharith argues that Chatfield's search of the vehicle and seizure of the handgun violated Soukharith's Fourth Amendment rights because it was obtained without his consent. The lower court did not reach the issue of consent because it determined that the handgun would have been found during the inventory search performed by Chatfield and Novak. Although

the State bases its argument on the inventory-search theory, it is unnecessary to decide the issue. A thief has no legitimate interest of any kind in a stolen vehicle and therefore, does not have standing to challenge a search of such a vehicle. *State v. McFarland*, 195 Neb. 394, 238 N.W.2d 237 (1976). See, also, *U.S. v. Tropiano*, 50 F.3d 157, 161 (2d Cir. 1995) ("defendant who knowingly possesses a stolen car has no legitimate expectation of privacy in the car"); *Burgeson v. State*, 267 Ga. 102, 475 S.E.2d 580 (1996); *State v. Otte*, 74 Ohio St. 3d 555, 660 N.E.2d 711 (1996), *cert. denied* 519 U.S. 836, 117 S. Ct. 109, 136 L. Ed. 2d 62. As discussed below, Soukharith's conviction for robbery (theft of the vehicle) is supported by the evidence, and thus, we conclude that Soukharith has no standing to challenge the search of the vehicle under the Fourth Amendment.

### 3. Search and Seizure of Envelope and Letter

Soukharith argues that the search and seizure by Hudson and Branigan of the envelope and letter violated his Fourth Amendment rights. The U.S. Supreme Court held in *Stroud v. United States*, 251 U.S. 15, 40 S. Ct. 50, 64 L. Ed. 103 (1919), that when voluntarily written letters come into the possession of prison officials under established practice, reasonably designed to promote the discipline of the institution, there is no unreasonable search and seizure under the Fourth Amendment. In *United States v. Kelton*, 791 F.2d 101, 103 (8th Cir. 1986), *cert. denied* 479 U.S. 989, 107 S. Ct. 583, 93 L. Ed. 2d 586, the U.S. Court of Appeals held that opening and copying a prisoner's outgoing mail was "justified in light of the legitimate objectives of the prison system" when it served to deter threatened criminal activity. "[A]lthough prisoners retain some fourth amendment rights while in prison, these rights are limited by institutional security needs and the prisoner's reduced expectation of privacy." *Id. Stroud v. United States, supra*, and *United States v. Kelton, supra*, were followed in *U.S. v. Brown*, 878 F.2d 222 (8th Cir. 1989). In *Brown*, a pretrial detainee wrote an inculpatory letter to his mother. An official seized and read the letter because the detainee was potentially suicidal. The court held that a jailer has a legitimate governmental interest in prisoner safety that was implicated by the suicidal tendencies of the

detainee, and thus, seizure of the letter did not violate the detainee's Fourth Amendment rights. The court stated that seizure of outgoing mail need not take place pursuant to a written policy and that it was sufficient for the jailer to follow " 'established practice.' " *Id.* at 226.

In the instant case, the trial court determined that Soukharith was a suicide risk and a risk to the team of officers slated to transport him to Sarpy County, and that, based on those concerns, seizure of the envelope did not violate Soukharith's constitutional rights. The detention center maintained a protocol, concerning the handling of inmate mail, which was followed by the prison staff and communicated to the prisoners. The protocol provided that detention facility staff could inspect all outgoing mail, except privileged mail, if there was a reason to suspect a threat to public safety or the security of the facility. Hudson and Branigan knew that Soukharith was on "close watch" when he arrived at the detention center and was considered suicidal. Although Soukharith had been taken off close watch by the time the envelope was seized, his initial status as a suicide risk, coupled with the unusual question marks on the envelope, indicated that it might have contained a suicide letter. The risk of Soukharith's committing suicide is an aspect of facility security. The U.S. Supreme Court has stated that prison administrators "are under an obligation to take reasonable measures to guarantee the safety of the inmates themselves." *Hudson v. Palmer*, 468 U.S. 517, 526-27, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984). Furthermore, Branigan knew the seriousness of the crimes with which Soukharith was charged and had information concerning possible gang affiliations. Based on this knowledge and the unusual address of the envelope, Branigan thought Soukharith could "go off," or attempt an escape, which presented a risk to the public safety of the transporting officers.

A trial court's ruling on a motion to suppress, apart from determinations of reasonable suspicion to conduct investigatory stops and probable cause to perform warrantless searches, is to be upheld on appeal unless its findings of fact are clearly erroneous. *State v. Konfrst*, 251 Neb. 214, 556 N.W.2d 250 (1996). In making this determination, an appellate court does not reweigh the evidence, but, rather, recognizes the trial court as

the finder of fact and takes into consideration that it observed the witnesses. *Id.* Neither probable cause nor reasonable suspicion is required to search and seize outgoing inmate mail. See, *Stroud v. United States, supra*; *United States v. Brown, supra*; *United States v. Kelton, supra.* We cannot say the trial judge's ruling was clearly erroneous in finding that Branigan had a legitimate governmental interest in opening the letter and reading its contents and that he did so according to established policy.

### 4. INEVITABLE DISCOVERY

The trial judge found that Sheriff Puls' interrogation of Soukharith was illegal, since it was conducted despite Soukharith's having requested the assistance of counsel. Soukharith revealed the location of Karen's body during the interrogation, which information was then transmitted to the FBI and led to the discovery of the body, shell casing, and shoe-impression evidence. The trial judge found that the crime-scene evidence was the "fruit of the poisonous tree," but gave the State an opportunity to show that the evidence inevitably would have been discovered. After a hearing on the issue and some additional trial testimony, the trial judge found that the State proved by a preponderance of the evidence that the body "easily" would have been discovered by May 26, 1995. Soukharith asserts that the trial judge erred in finding that the State met its burden to show by a preponderance of the evidence that the crime-scene evidence inevitably would have been discovered.

(a) Applicability of Inevitable Discovery Doctrine
Soukharith relies on *State v. Andersen*, 232 Neb. 187, 440 N.W.2d 203 (1989), to argue that because no search had been initiated prior to Puls' illegal interrogation, the inevitable discovery doctrine does not apply. In *Andersen*, this court adopted the inevitable discovery doctrine:

"If the State shows by a preponderance of the evidence that, disregarding any police misconduct in obtaining the evidence in question, the disputed or controversial evidence would have been produced or obtained by proper police investigation entirely independent of the illegal investigative conduct, then such evidence is admissible

pursuant to the 'inevitable discovery' doctrine. . . . '[I]nevitable discovery' involves two lines of investigation, one tainted and the other lawful, but the lawful line of investigation is not consummated in production of evidence. However, by the requisite preponderance of evidence, the State must demonstrate that some lawful means of discovery, not an illegal investigation, would have produced the evidence in question, that is, such evidence inevitably would have been discovered without existence of any police misconduct."

232 Neb. at 199-200, 440 N.W.2d at 213-14 (quoting *State v. Evans*, 223 Neb. 383, 389 N.W.2d 777 (1986)).

In *Andersen*, the police illegally seized an address book from Andersen's home. The address book contained a name which led police to several individuals who later testified against Andersen. At the time, Andersen was a suspect in an independent investigation. We affirmed the lower court's ruling, holding that the names inevitably would have been discovered by the independent investigation.

Our holding in *Andersen* does not indicate that a *search* for the specific item discovered, i.e., the address book, must be ongoing for the inevitable discovery doctrine to apply. See, also, *U.S. v. Kennedy*, 61 F.3d 494 (6th Cir. 1995) (holding that inevitable discovery exception to exclusionary rule applies when prosecution can demonstrate *either* existence of independent, untainted investigation that inevitably would have uncovered same evidence or other compelling facts establishing that disputed evidence inevitably would have been discovered), *cert. denied* 517 U.S. 1119, 116 S. Ct. 1351, 134 L. Ed. 2d 520 (1996); *U.S. v. Ramirez-Sandoval*, ·872 F.2d 1392 (9th Cir. 1989) (holding there is no requirement that evidence be obtained from previously initiated, independent investigation so long as police inevitably would have uncovered evidence following routine procedures). Rather, *Andersen* requires that there be an independent *investigation*, of which the search that inevitably would result in discovery of the evidence may be but a part. Here, as discussed below, agent Mott's investigation was ongoing when Puls illegally interrogated Soukharith. Although the FBI had not begun a physical search for Karen's body, Mott

testified that, absent any assistance from Puls, the search would have been conducted. Soukharith's assignment of error is without merit.

### (b) Sufficiency of Evidence to
### Support Inevitable Discovery

Soukharith also argues that the State failed to prove by a preponderance of the evidence that the crime scene inevitably would have been discovered. We disagree. Mott, the FBI agent in charge of the investigation, admitted that he talked with Puls on May 24, 1995, about the location of the body and relied on the information that Puls gave him in conducting the search. Mott had, however, started his investigation on May 23, the day Karen disappeared. He knew that a series of calls had been placed on Karen's cellular phone, so his first step was to subpoena records for that phone. The records indicated that Karen's last phone call was picked up by an Omaha cell tower at 49th and F Streets at about 10:47 a.m. By the evening of May 23, Mott had reduced the area of the search to a narrow corridor along I-80 from the western edge of Omaha to the point where Soukharith was arrested in Wyoming. Mott made this determination based upon the location of the last telephone call, the point of arrest, and the difference between the time when the call was placed and the time when the arrest was made. Mott testified that it would have taken Soukharith approximately $8\frac{1}{2}$ to 9 hours to get from Omaha to the point where he was arrested. Since the call picked up by the cell tower in Omaha was made at 10:47 a.m. and Soukharith was stopped in Wyoming at about 6:30 p.m., Mott considered it unlikely that Soukharith had gone far off the Interstate to dispose of anything.

Moreover, other information was available for Mott to further narrow the search. On May 23, 1995, Paul Schmitz, who regularly commutes between Omaha and Lincoln, saw a white Mitsubishi 3000 GT with Polk County, Iowa, license plates pulled over on the side of the eastbound lane of I-80, about 1,000 feet from the Platte River bridge on the west side of the river. He saw a person he described as an African-American male in his early twenties by the car, who was watching a white woman in her forties walk down into the ditch. Later that night,

Schmitz saw a news broadcast concerning the incident and immediately called the FBI and reported what he had seen. He was not interviewed by the FBI until May 26, but Mott testified that a summary of what Schmitz had seen was available to the FBI on May 24. Mott testified that although there was no " 'X' marks the spot," leads provided by witnesses such as Schmitz would have narrowed the focus, and that was where the most intensive efforts would have begun.

Mott testified that law enforcement would have conducted a search. Mott was prepared to use at least four aircraft in the search. He would have contacted the Omaha Police Division, the Nebraska State Patrol, and the Douglas and Sarpy Counties police, and enlisted the help of the National Guard if necessary. Mott also had undertaken steps to enlist public assistance. A great deal of publicity concerning Karen's disappearance, including pictures of both her and the car, was being generated in Des Moines, and similar efforts were being made in Omaha.

Thus, testimony at the suppression hearing indicates that Mott had initiated an independent investigation in Nebraska that in no way relied on Puls' unlawful interrogation in Wyoming. The search had been reduced to a narrow corridor along I-80 from Omaha to Wyoming. Mott's testimony indicates that Schmitz' report would further have focused the search on an area around where the Interstate crosses the Platte River in Sarpy County. The search would have been extensive, enlisting the help of numerous law enforcement agencies and the public at large. Based on this testimony, the trial judge's finding that the crime scene would have been found by May 26, 1993, and its evidentiary value retained, is not clearly wrong.

### 5. SUFFICIENT EVIDENCE TO SUPPORT VERDICT

Soukharith asserts that the evidence was insufficient to support the jury's verdict. Although he acknowledges our decision in *State v. Pierce*, 248 Neb. 536, 537 N.W.2d 323 (1995), Soukharith asserts that because the evidence in this case was entirely circumstantial, inferences from the evidence should be viewed in the light most favorable to the accused, citing, inter alia, *State v. Skalberg*, 247 Neb. 150, 526 N.W.2d 67 (1995). We

decline to revisit *Skalberg* and review this case according to the standard set forth in *Pierce.*

"In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the conviction."

*State v. Pierce,* 248 Neb. at 548, 537 N.W.2d at 330-31.

### (a) Robbery

Neb. Rev. Stat. § 28-324 (Reissue 1995) states: "A person commits robbery if, with the intent to steal, he forcibly and by violence, or by putting in fear, takes from the person of another any money or personal property of any value whatever." Motorists observed Karen's car near the Platte River bridge the same morning she was killed. Schmitz testified that he saw a white woman in her forties walking down into the ditch by the bridge while an "African-American" man watched from the roadside. Karen was killed in that area. When Karen's car was stopped in Wyoming, Soukharith claimed that it was his car. Soukharith said he purchased it from a man named "Wonum," but there was no evidence of this transaction in the record. The evidence, when construed most favorably to the State, is sufficient to support a finding that Soukharith took Karen's car by use of force with intent to steal in Nebraska.

### (b) Kidnapping

"A person commits kidnapping if he abducts another or, having abducted another, continues to restrain him with intent to . . . [c]ommit a felony . . . ." Neb. Rev. Stat. § 28-313 (Reissue 1995). On the day she was killed, Karen did not come to work. When she spoke to her family on the phone that morning, she sounded distraught. Two motorists saw what appeared to be Karen and a dark-complected man near the Platte River bridge that day, the area where she was killed and robbed. The record also reflects that her last call was made in Nebraska, and, as already discussed, the evidence is sufficient to support the rob-

bery conviction. When construed most favorably to the State, there is sufficient evidence of the elements of abduction with continued restraint and intent to commit a felony to support the conviction of kidnapping in the State of Nebraska.

### (c) Murder and Use of Weapon

"A person commits murder in the first degree if he kills another person . . . in the perpetration of . . . robbery [or] kidnapping . . . ." Neb. Rev. Stat. § 28-303(2) (Reissue 1995). "Any person who uses a firearm . . . to commit any felony which may be prosecuted in a court of this state . . . commits the offense of using firearms to commit a felony." Neb. Rev. Stat. § 28-1205(1) (Reissue 1989). Karen died of a gunshot wound to her back near the Platte River bridge in Sarpy County. A shell casing found near her body was fired from the handgun found in her car when Soukharith was stopped in Wyoming. The physical size, shape, and pattern of shoe impressions taken from the crime scene matched Soukharith's shoes. Finally, while in detention, Soukharith wrote a letter that is tantamount to a confession to the crime. We have previously concluded that there is sufficient evidence to support the robbery and kidnapping convictions. Furthermore, there is sufficient evidence that Soukharith used the handgun found in Karen's car to kill Karen during the perpetration of a kidnapping and robbery, which is enough to support the convictions for murder and use of a weapon to commit a felony.

### V. CONCLUSION

We conclude that all of Soukharith's assigned errors are without merit. As a result, we affirm.

AFFIRMED.

FAHRNBRUCH, J., Retired, concurs in the result.